**UNITED STATES of America, Plaintiff,**

**v.**

**William M. BOGAS, a.k.a. Nick Bogas, Defendant.**

**Crim. A. No. CR88–282.**

United States District Court,
N.D. Ohio, E.D.

Feb. 13, 1990.

Gregory Sasse, for U.S.

Nicholas DeVito, Bernard J. Stuplinski, Cleveland, Ohio, for defendant.

## SENTENCING MEMORANDUM

ANN ALDRICH, District Judge.

William Bogas is here for sentencing on a criminal conviction based on his guilty plea involving the failure to report the disposal of hazardous wastes at the Cleveland Hopkins Airport. The government urges the Court to apply the stiffest possible penalties—to make an example of the "nation's first hazardous waste violation under the new sentencing guidelines." This Court acknowledges the necessity for stringent enforcement of laws protecting our environment. Disregard for such laws places all of us at risk. Such concerns, however laudable, do not absolve the government from proving the facts necessary under the Guidelines to support the imposition of the stringent penalties it seeks. It is not disputed that the government bears the burden of proving, by a preponderance of the evidence, the facts necessary to support adjustments upward in the sentence imposed. *United States v. Silverman*, 889 F.2d 1531, 1537 (6th Cir. 1989). For this purpose, evidence was taken at a hearing which extended over a period of five days, and included twenty-three witnesses, and fifty-two exhibits. After considering all the evidence presented, the Court concludes that the government, for the most part, has failed in its proof.

## I

Bogas was indicted on five counts, all of which involved the digging of a pit at the Cleveland Hopkins Airport and the disposal, in March of 1988, into that pit of barrels containing a variety of chemicals. Bogas thereafter plead guilty to two counts of this indictment, Counts II and V. The remainder of the criminal charges are to be dismissed upon sentencing. Count II charges that on March 10, and 11, 1988, a quantity equal to or greater than one hundred pounds of a hazardous substance was released into the environment without a federal permit, and that Bogas failed to notify the EPA as soon as he had knowledge of this release, thereby violating Title 42, United States Code, Section 9603(b)(3).

Count V charges that on March 15, 1988 Bogas made a false statement to Edward Burk of the U.S. EPA by stating that only eight to ten empty drums, which had previously contained water based paints, were disposed of in the pit, when he well knew that drums containing toluene and other liquid wastes had been buried in the pit, in violation of Title 18, United States Code, Section 1001.

To determine the appropriate sentence, the Sentencing Guidelines ("the Guidelines") promulgated pursuant to Title 28 U.S.C. § 994 require that the Court first apply the offense guideline section in Chapter Two which is most applicable to the offense of conviction. *United States v. Silverman*, 889 F.2d 1531, 1537 (6th Cir. 1989) (citing § 1B1.2(a) of the Guidelines). Both the government and Bogas agree that pursuant to § 3D1.2(b)[1] the two counts of conviction are combined and regarded as a single group because they involve the same criminal objective. To determine the offense level for this group, the Court must look to the most serious of the offenses involved, which is Count II. § 3D1.3(a).

Count II is encompassed in § 2Q of the Guidelines which relates to offenses involving the environment and more specifically to § 2Q1.2, entitled "Mishandling of Hazardous or Toxic Substances or Pesticides; Recordkeeping, Tampering and Falsifica-

---

**1.** Citations in this form, unless otherwise noted, refer to the Guidelines.

tion." Both the government and Bogas agree that the base offense level under this section is 8. Both also agree that Bogas has a criminal history score of 0, which under the Guidelines is a criminal history category of I.

Once this base offense level has been determined, the Court may adjust the level either upward or downward in two ways. The first requires the Court to examine the "relevant conduct" and within the framework set forth in the Guidelines make adjustments either upward or downward. Once this process is completed the Court may depart from the Guideline range if the Guidelines have failed to adequately account for factors which are present in a specific case. § 5K2.0.

## II

Bogas was the Commissioner of Cleveland Hopkins Airport since 1978 until his retirement in 1988. (Tr. 739, 808). He had been employed by the airport since 1954. (Tr. 739). As Commissioner, he was responsible for the day-to-day operations of the airport, including general maintenance and clean-up as well as the oversight of the painters' operations. Bogas closely supervised the operations and expected that work be performed to his satisfaction. He also required compliance with the rules such as not using the garage to work on personal vehicles, not performing personal tasks while on city time, and the wearing of uniforms. The government implies that there is something sinister about Bogas's strict management style. However, this Court fails to see anything evil or culpable in a supervisor requiring compliance with work rules and requiring that a job be well done.

His direct supervisor was Jacqueline Shuck, Director of Port Control for the City of Cleveland. (Tr. 740–41). Shuck, an attorney, testified that she supervised three divisions: Cleveland Hopkins Airport, Burke Lakefront Airport and the Division of Harbors. Her primary responsibilities were administrative and financial. (Tr. 487). She was responsible for all interactions with city hall and the city council.

(Tr. 488). After March of 1988 she set the environmental policy for the airport. Previously, there had been no policy. (Tr. 507, 514). Deputy Commissioner, Phil Schwenz; the maintenance manager, Cain Edgerson; and the heads of the following departments: building and maintenance, field maintenance, fire, and custodial, reported directly to Bogas. (Tr. 741).

The painters were responsible for maintaining the runway stripes. They used quick-drying oil based paint, toluene, and xylene. (Tr. 248–49). During the painting season prior to the digging of the pit, the painters generated some seventy-five to eighty used paint drums and six to nine drums of waste solvents. (Tr. 253–54).

Painters, Kevin McNally and Aaron Chisolm testified extensively concerning the procedures used for painting. During the 1987 painting season immediately prior to the dumping in the pit in March, the painters had two fifty-five gallon drums of toluene and one of xylene. The xylene was used to clean the truck tank and hoses and was not reused. The toluene was used to clean the painting tips and nozzles and was reused. The toluene was also mixed with paint as a thinner. Toluene evaporates when exposed to air, so during use it necessarily becomes depleted. (Tr. 171). Thus, it is clear that there could not have been 110 gallons of toluene dumped into the barrels and then into the pit. Some percentage would be lost due to evaporation during the painting season. The toluene and xylene were stored under lock and key. (Tr. 245).

When painting, not each fifty-five gallon drum of paint could be used completely. Some were not properly mixed and portions of the paint could not be run through the painting truck. (Tr. 207–08). The paint barrels that were empty were left open. Those with unusable paint or crud from cleaning out the truck were capped. All were stored together. (Tr. 212–13). When the painters ran out of space, they would call field maintenance and have the barrels moved over to the test track area. (Tr. 213). Chisolm estimated that during 1987 he filled three drums with waste solvents,

which included paint residue from the cleaning operations. (Tr. 218). Chisolm was able to identify many of the barrels which were extracted from the pit as having come from his painting operation. (Tr. 218–36).

Bogas was aware of the presence of xylene and toluene at the airport. In 1982, he issued a memorandum explaining that toluene was a hazardous substance and if released into the environment, the EPA needed to be contacted. (Tr. 826–27). The City of Cleveland, in 1988, began implementing a right-to-know program to educate workers about their handling of potentially dangerous substances. (Tr. 402). James Brown, airport safety supervisor, was in charge of the program and he briefed Bogas concerning the program. (Tr. 404).

In March 1988, as part of a general spring clean-up, Bogas contracted to have a pit dug at the end of one runway. He instructed that it was to be filled with rubbish from around the airport—materials such as concrete, and the barrels, which he believed to be empty. (Tr. 750). He also requested that the pit be covered each evening and there is conflicting evidence as to whether that request is unusual. (Tr. 270, 852). On Thursday, March 10, 1988, workers Jerry Codner, Jim Arcuri, Harry Kinney and Jesse Reed were assembled to begin the clean-up. (Tr. 447). Bogas did not deal directly with the workers but routinely dealt with their supervisors. (Tr. 619). On this occasion, Cain Edgerson informed Thomas Allegier, superintendent of field maintenance, to assemble the crew. (Tr. 447). Bogas was at the pit several times that Thursday and Friday while loads were being dumped. (Tr. 279–80). The drums taken from the test track area were not empty and contained paint residue, chemicals and water. (Tr. 290, 294, 296).

On Friday, March 11, 1988, the clean-up was discussed at a staff meeting. The testimony concerning what was said at this meeting is in conflict. It is clear that the subject of disposing of toluene, along with other questionable materials, arose. (Tr. 420). Two persons, Tom Allegier, the superintendent of field maintenance, and Wil-

liam Wright, the airport fire chief, testified that in response to concerns about toluene and EPA regulations, Bogas said something to the effect of, "I'm the EPA at this airport." (Tr. 452, 355). However, Phil Schwenz had no recollection of that statement and indeed testified that he, at the meeting, stated that nothing should go into the pit, such as toluene, which may cause problems. (Tr. 677–82). Bogas denied making such a statement. (Tr. 780). James Brown, the airport safety supervisor, does not recall hearing such a comment. (Tr. 420). What is clear from the testimony is that at some point in the meeting several people began talking at the same time, a comment was made which elicited laughter, and then the meeting proceeded. There are differing versions about what was said by whom.

On the 11th, the Brook Park Fire Department, the Ohio EPA and the United States EPA all received tips that hazardous wastes were being buried at the airport. Rusak from the Brook Park Fire Department came out to the scene as did investigators from the Ohio EPA. Rusak called the airport to discuss the report and Bogas immediately returned his call. Bogas told Rusak that solid waste was being buried and that Rusak could come look at the pit. (Tr. 364).

At about 2:00 pm that day, Bogas, Bill Wright and Rusak all met at the pit. Bogas told them that there were no fifty-five gallon drums buried there and that what was there was what could be seen. (Tr. 365). At that time only fence posts and broken concrete were visible. (Tr. 364–65).

Around 3:00 pm Bogas learned that the Brook Park police had stopped an airport dump truck and had the driver in the patrol car. (Tr. 761, 367). When Bogas arrived at the pit, two Ohio EPA officials, Theresa Sabol, and Chris Coder, were there. Bogas told them that construction debris, concrete and fencing was being buried in the pit and denied that any hazardous material was going into it. (Tr. 378–81, 830–31). He did not tell them that fifty-five gallon drums were being buried there. (Tr. 831). Coder and Sabol saw a freon canister in the pit

which could not be legally disposed of there. (Tr. 382–85). Based upon that, they ordered the pit secured over the weekend, an order with which Bogas complied. (Tr. 382–85, 791). Bogas also gave them the names of all the employees involved in the dumping, (Tr. 790), and arranged on Monday to have the pit excavated. (Tr. 788).

Chris Coder, of the Ohio EPA, testified that on Monday, March 14, 1988, Bogas stated that ten to twelve empty drums had gone into the pit. (Tr. 386–87). Bogas denies making such a statement to Coder. (Tr. 793). On Tuesday, March 15, 1988, the United States EPA contacted Bogas and he told them that eight to ten empty drums had gone into the pit. Bogas knew that a significant number of drums, around a hundred, had been buried at the pit. The environmental criminal investigator, located in Chicago, then canceled a flight he had booked to Cleveland. (Tr. 540–42). On March 30, 1988, Bogas gave a statement to FBI special agent Brian St. Bernard, admitting that he ordered drums into the pit but denying that he ordered drums containing toluene into the pit. (Tr. 591–93).

Bogas testified that he did not order the disposal of hazardous wastes or barrels containing chemicals. (Tr. 781). He believed that the barrels were empty and did not know until Thursday, March 17, 1988, that the barrels were not empty. (Tr. 796, 751).

Shuck testified that prior to March 1988 the airport had no hazardous waste policy. (Tr. 489, 507, 514, 531). She had never thought about the disposal of hazardous wastes or the disposal of the painters' drums and waste chemicals. (Tr. 493). However, the airport had had dealings in late 1986—early 1987 with the EPA concerning the disposal of PCB's and smoke alarms. (Tr. 515). The airport was notified by the EPA that it was in violation of EPA regulations involving PCB's. (Tr. 526). Shuck testified that she travelled to the EPA in Chicago to negotiate the fines paid by the city for the PCB's disposal, and that this episode did not involve Bogas in anyway. (Tr. 526–27). Bogas had not been personally involved with these mat-

ters. (Tr. 772–76). Director Shuck had handled all matters involving the EPA.

### III

We turn now to the five specific areas addressed by the parties at the sentencing hearing, which might involve departures from the Base Offense Level of 8 points.

### A. ENVIRONMENTAL CONTAMINATION

█ The first issue in dispute is the correctness of paragraph 40 of the Presentence Investigation (PSI) which states:

Section 2QI.2(b)(1)(B) indicates that if the offense involves the discharge or release of a hazardous substance, increase by 4 levels. Offense conduct indicates that these chemicals would find their way into the Rocky River and then into Lake Erie, a source of drinking water. The assumption is made that since some of the barrels were leaking, the chemicals were released to the environment.

Section 2Q1.2(b)(1)(B) provides as follows: "If the offense otherwise involved a discharge, release, or emission of a hazardous or toxic substance or pesticide, increase by 4 levels." The commentary states that the section "assumes a discharge or emission into the environment resulting in actual environmental contamination." Thus, there is a fact issue of whether there was *actual*, as opposed to hypothetical, or "assumed", contamination.

The Court finds that the government has produced no evidence which shows that either Rocky River or Lake Erie either have been, or will be, contaminated by the dumping. (Tr. 70).

There are three potential areas of contamination involved here—water, air and soil. The evidence concerning water contamination shows that the 20,000 gallons of water pumped out of the pit was not a hazardous waste. See, Letter from William P. Skowronski, District Chief of the Ohio EPA to the Director of the Northeast Ohio Regional Sewer District. Defendant's Ex. A). Skowronski stated that this waste water could be disposed of by using the

normal regional sewer system. There is no evidence of ground water contamination. (Tr. 70–71, 713–14).

The government argues that an inference should be made that there will be contamination of the water at some point in the future. This Court is unwilling to increase a defendant's sentence by making an inference that is unsupported by any evidence. Indeed, the only expert to testify concerning future ground water contamination, Dr. Coburn, indicated that the soil in the area, because of prior dumping of foundry sand, acts as a natural carbon filter, decreasing the risk of any ground water contamination. (Tr. 716–17). The government has failed to prove by a preponderance of the evidence actual contamination of the water.

Dan Watson, the government's expert, testified regarding soil contamination. Of the 500 substances tested for, 497 were not detectable. The three that were detected were lead, cadmium and toluene. (Tr. 115–17). None of these three were detected in amounts that would be dangerous in the soil. (Tr. 115, 117, 136). Dr. Coburn, a geophysics expert, also testified concerning the government's soil tests. He stated that complete testing would also require tests of the soil around the pit to determine what the base level was for these chemicals in this particular soil. (Tr. 715). Without a comparison to the surrounding soil, the Court cannot determine whether the chemicals found in the soil are actually "contaminating" the soil.

Based on this testimony and the testing, this Court can only conclude that any contamination to the soil was minimal and not dangerous.

Last, the government argues that the court should find that the air was contaminated. During the excavation of the pit, tests of the air showed organic vapors of sufficient concentration that the investigators could not safely continue their work wearing only respirators. (Tr. 30). The workers were required to use breathing apparatus equivalent to scuba diving equipment. (Tr. 31). This is the only evidence of air contamination.

This Court does not consider this evidence of contamination to be of a sufficient magnitude to warrant an adjustment upwards under the Guidelines.

### B. COST OF CLEAN UP

■ The government and the PSI also request an addition of another 2 levels for the cost of clean-up pursuant to § 2Q1.2(b)(3), which provides that if a clean-up requires "substantial expenditure", an increase of 4 levels is warranted. The commentary indicates that a departure of plus or minus is appropriate depending on the level of contamination. The PSI recommends an increase of only 2 because although the EPA estimates the cost at $350,000.00, this is not a substantial expenditure in the hazardous waste arena.

The government statement that the cost of $350,000 is undisputed (Government's Brief at p. 32) is not accurate. Bogas has consistently contested the validity of that estimate. Such misstatements do not aid the government in meeting *its burden* of proof.

The estimate of $350,000 is not only speculative, it also includes the costs of opening the pit and doing the testing necessary to investigate any possible criminal violations. This estimate, contained in Exhibit 25, was prepared by James Swanson, an investigator with the U.S. EPA, during the hearing. It is based on figures submitted by Jackie Shuck, (Tr. 498–500), Bogas's direct supervisor, as well as figures Swanson received from the State of Ohio and offices within the U.S. EPA. Neither he nor Shuck had direct knowledge concerning the validity of the figures. (Tr. 542–48). This figure also includes costs for several different sampling tests by several laboratories.

Bogas submitted the testimony of Pete Boyas, president of Boyas Excavating Company, who has forty-two years experience in excavation. His business did about $40,000,000 worth of excavation work per year and much of that work involved hazardous wastes and compliance with state and federal regulations. (Tr. 845–46). Specifically, much of the work Boyas does

involves cleaning up for clients, such as steel mills, so that they will be in compliance with EPA regulations. He estimated that his company would charge $10,300 to excavate and clean out the pit site. (Tr. 850–57). This estimate was based on the assumption that there were barrels containing toluene but the location of the barrels were not known. (Tr. 853). To insure that the drums were not damaged and the chemicals released, the drums would be reached and dug out by using the "angle of repose." (Tr. 855). The Court found Boyas to be a credible witness. He was candid, forthright and knowledgeable.

The Court reads the commentary strictly. It requires an adjustment upwards for substantial costs in the actual clean-up, and it does not reference costs of the investigation[2]. Some sampling and testing will be necessary in order to adequately clean-up a site. However, the figures presented by the government involve duplication of efforts and costs which were incurred as the result of their investigation. There will be some overlap in cases such as this between the cost of investigation and the clean-up, but the government has provided this Court with no credible means of ascertaining what the proper apportionment of costs may be.

The Court finds Boyas very credible and an expert in the clean-up of hazardous waste sites. The government presented no person with direct knowledge of the means and the cost of the clean-up of the pit. Accordingly, the Court finds that the figure of $350,000 presented by the government is not realistic nor does it adhere to the requirement that the Court examine the cost of clean-up apart from the cost of investigation. There have been, and will be, costs involved in the clean-up of this site. However, because the cost of $350,-000 has not been proved by a preponderance of the evidence as costs of clean-up rather than costs of investigation, this Court declines to increase the offense level for cost. The only credible evidence

presented regarding the cost of actual clean up as opposed to cost of investigation shows a cost of $10,300 which is significantly less than the government's estimate. Accordingly, no levels will be added for cost of clean-up.

## C. PERMIT REQUIREMENT

■ The government and the PSI also request that 4 points be added because the offense involved disposal of hazardous waste without a permit and Bogas did not have a permit. Section 2Q1.2(b)(4) provides that "if the offense involved transportation, treatment, storage, or disposal without a permit or in violation of a permit, increase by 4 levels." The parties concede that neither Bogas nor Cleveland Hopkins Airport had a permit. The question is quite simply whether a permit was required.

The pertinent regulation provides:

RCRA [Resource Conservation and Recovery Act, 42 U.S.C. § 6091 *et seq.*] requires a permit for the "treatment," "storage," and "disposal" of any "hazardous waste" as identified or listed in 40 CFR Part 261.

40 C.F.R. § 270.1(c) (1988).

Disposal is defined as follows:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on any land or water so that such hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged in to any waters, including ground water.

40 C.F.R. 270.2 (1988).

Here, there is no doubt that the toluene was a hazardous waste and that it, in some form, was dumped or placed onto land such that the substance could enter the environment. Contrary to Bogas's assertion, it makes no difference that the airport was not in the business of disposing of hazardous materials. Nor does the permit make

---

**2.** If the Sentencing Commission wanted to add levels for the cost of the investigation, they would have indicated that. To this Court's knowledge, no other portion of the Guidelines call for increased penalties based on an assessment of the costs of investigating the crime involved.

an exception for those who do not "intend" to dispose of hazardous wastes. The government has shown by a preponderance of the evidence that a permit was required.

■ The commentary to this section, however, allows the Court to depart downward up to two levels "depending upon the nature and quantity of the substance involved and the risk associated with the offense...." The Court finds that both the quantity and the risk involved were so small that an increase of two, rather than four, levels is appropriate.

### D. ORGANIZER OF CRIMINAL ACTIVITY

■ Section 3B1.1(a) allows an addition of 4 levels if the defendant was an organizer or leader of a criminal activity that involved five or more persons. The government and the PSI also request the addition of 4 levels to the Guideline basic offense level because, "[d]uring the offense behavior, the defendant directed at least ten people: a bulldozer operator, the acting head of field maintenance, two crew foremen, and six crew members." PSI at ¶ 43.

This section states as follows:

§ 3B1.1. *Aggravating Role*

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels,

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

The introductory commentary indicates that this section is to apply where "an offense is committed by more than one participant." A participant is defined in Application Note 1 as "a person who is *criminally responsible* for the commission of the offense, but need not have been convicted." (emphasis added).

The Sixth Circuit recently addressed what is required for an adjustment upward pursuant to this section. *United States v. Carroll*, 893 F.2d 1502, (6th Cir.1990). The Court declined to find that subsection c allowed enhancement upwards where a single offender engaged the services of several innocent people. 893 F.2d at p. 1509. The court held that "enhancement pursuant to § 3B1.1 requires the participation of at least two *culpable* individuals so that leadership of some criminal enterprise or organization, however minimal, can be claimed." *Id.*

The government argues that "in view of the way Bogas ran the airport, it is inconceivable that Bogas did not organize and lead this hazardous waste dumping at Cleveland Hopkins Airport." Government's Brief at page 33. The government further argues that "[t]he dumping crew workers' knowledge of [the] criminal nature of their activities is also amply demonstrated by the fact that it was they who were making the anonymous tips regarding 'the dumping of toluene and other hazardous wastes at the airport.' " Government's Brief at p. 34, see also p. 9.

The person or persons who made anonymous phone calls to the Brook Park Fire Department, the Ohio EPA and the United States EPA were never identified at the sentencing hearing. (Tr. 99, 361, 376, 394). Dan Watson, of the U.S. EPA, testified that the person identified himself as a worker who was involved in the disposal of the drums. (Tr. 99).

The Court finds that the facts presented at the hearing fail to sustain the government's burden of proving that Bogas lead a criminal enterprise involving other participants. The proof presented fails to show culpability on the part of any of the workers involved. The existence of anonymous tips, which are still anonymous, is not sufficient to support an inference that any, or all, of these workers were "culpable."

### E. OBSTRUCTION OF JUSTICE AND ACCEPTANCE OF RESPONSIBILITY

■ The PSI and the government recommend that the offense level be adjusted upward two points under § 3C1.1 because

the "defendant's false statements impeded the administration of justice during the investigation of this offense." PSI at ¶ 45. Bogas has argued that this adjustment upwards is not appropriate and instead a downward adjustment should be made based upon his acceptance of responsibility.

Section 3C1.1 allows an addition of 2 levels where the defendant "willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense." The Application Notes list various conduct which may provide a basis for applying this section such as destroying evidence, testifying untruthfully, threatening witnesses, or jurors, or furnishing falsehoods to a probation officer. The list is not intended to be exclusive. The Commentary states that this section is to provide enhancement for a defendant who engages in conduct calculated to mislead or deceive authorities, or those involved in a judicial proceeding, or those who otherwise willfully interfere with the disposition of criminal charges.... "

Bogas instead requests that the Court adjust downward two points for acceptance of responsibility based on § 3E1.1 which provides that where "a defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels." Commentary four to this section in effect at the time the offenses were committed provided:

> An adjustment under this section is not warranted where a defendant perjures himself, suborns perjury, or otherwise obstructs the trial or the administration of justice (see § 3C1.1), regardless of other factors.

In November 1989 the commentary was amended to state:

> Conduct resulting in an enhancement under § 3C1.1 (willfully Obstructing or Impeding Proceedings) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustment under both §§ 3C1.1 and 3E1.1 may apply.

The note to the amendment states:

> The purposes of this amendment are to provide for extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 are appropriate, and to clarify the reference to obstructive conduct.

The Court must apply the Guidelines which were in effect at the time the underlying offense was committed. *United States v. Smith*, 887 F.2d 104 (6th Cir. 1989). However, the applicable Guideline has not been amended. The Commentary provides guidance to a court faced with the application of a particular Guideline. Changes to the Commentary reflect the Commission's continuing evaluation of the Guidelines in light of experience and can be used by a court as an aid in its application of the Guidelines.

Bogas argues that the statement made to the EPA on March 15, 1988, while false, did not obstruct justice because it did not disrupt a governmental function. The government argues that Bogas's lies to the EPA investigator caused the investigator to alter the course of his investigation and change his plans. The Application Notes also provide that in determining whether to increase the level under this section, the evidence should be viewed in a light favorable to the defendant.

Bogas plead guilty to willfully concealing material facts to a government investigator. The Commentary makes it clear that an *attempt* to obstruct justice or to impede an investigation is sufficient for the addition of the two levels. The section also contemplates that it will be applied in this precise situation where there are multiple counts—one of which involves behavior decision to prevent either the detection or prosecution of a crime, and where the multiple counts have been grouped. The Court, because of the guilty plea, must add these two levels.

The Court, however, is of the opinion that Bogas has also accepted responsibility for his crime. The commentary in effect at the time the crime was committed contemplated that if there were obstruction

there could be no acceptance of responsibility. However, since then the Commission clearly recognized that extraordinary cases may exist where both adjustments may be applicable. Clearly, prior to the amendment, the Guidelines had not adequately accounted for the situation presented here. At the time the false statement was made, Bogas had already cooperated with the authorities and had given them ready access to the pit. Thus, the falseness of his statement was easily ascertainable. Further, Bogas thereafter was unfailing in his continued cooperation with the authorities.

On March 11, 1988, after fire chief Rusak had called the airport regarding the anonymous tip, Bogas returned his call and told him that he was free to come and examine the pit. (Tr. 364) Rusak testified that Bogas did nothing to impede their investigation. (Tr. 371). When the Ohio EPA officials, Chris Coder and Theresa Sabol, arrived at the airport, Bogas showed them around, showed them Five Points Garage and the painter's operations and informed them of the discussion had at the staff meeting that very morning concerning hazardous waste, and specifically toluene. (Tr. 378–81). Ohio EPA requested that Bogas secure the area and arrange to have the pit dug up. He did both of these things. On Monday, March 14, 1988, he told them that there were 10–12 empty drums in the pit. (Tr. 387). Coder requested and was given the names of the workers involved in the clean-up. (Tr. 763, 790). On March 17, 1988, without the presence of counsel, Bogas was interviewed for several hours by EPA officials. (Tr. 799).

After retaining counsel, Bogas initiated contact with the Federal Bureau of Investigation's agent Brian St. Bernard. (Tr. 594). At that meeting on March 30, 1988, Bogas answered all questions put to him. (Tr. 594–596).

Further, the Court finds based upon all the evidence presented that Bogas believed that the drums at the test site were empty. The painters, in their operations, were supposed to empty the barrels in order to use all the paint purchased. "Empty" barrels were then sent to the test track. Bogas specifically told the workers to leave the barrels (which he knew contained chemicals such as toluene) stored at the garage. At the hearing, Bogas's testimony was forthright, and sincere.

On cross-examination, Bogas stated the following:

Q. Do you believe you did anything wrong between March 10 and March 18 of 1988?

A. I believe I did now, yes.

Q. Believe what?

A. I believe it now. I did not believe at the time that I had done any thing wrong. I didn't order anyone to do anything illegal. I didn't believe we were doing anything illegal, and by "we" I am talking about the airport during that period of time.

Q. What do you believe now?

A. Well, from what I found out about toxic waste, what I have learned since, then, yes, there was something done wrong.

The Court: And you are responsible because you were in charge?

A. That is correct, yes, ma'am.

The evidence presented to this Court convinces this Court that Bogas committed these crimes through a lack of understanding and knowledge. That does not excuse the underlying offenses. However, the Court finds that Bogas has accepted responsibility for what occurred and even before he had a full understanding of the situation, acted to aid, rather than to impede, investigating authorities. Accordingly, the Court finds that a decrease of two levels is warranted for Bogas's acceptance of responsibility

### IV SUMMARY

Guideline Range

| | |
|---|---|
| Base offense Level | 8 |
| Contamination | 0 |
| Cost of Clean up | 0 |
| Permit Requirement | 2 |
| Leadership Role | 0 |
| Obstruction of Justice | + 2 |
| Acceptance of Responsibility | − 2 |
| Total Points | 10 |

## V SENTENCE

Pursuant to the sentencing table, an offense level of 10 and a criminal history level of I requires a sentence of not less than six nor more than twelve months imprisonment.

Section 5C1.1(c) provides:

If the minimum term of imprisonment ... is at least one but not more than six months, the minimum may be satisfied by ... 2) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in 5C1.1(e)....

5C1.1(e) allows one day for one day, intermittent confinement *or* community confinement *or* home detention.

Because the court finds the permissible sentence under the Guidelines to be appropriate in this case, it has not considered the factors that might warrant a downward departure that are set forth in the PSI at paragraph 77. Nor have we taken into consideration the some thirty letters supporting Mr. Bogas, nor the recent supportive petitions signed by twenty-eight of Mr. Bogas's co-workers at Cleveland Hopkins Airport. These petitions were filed in response to a Plain Dealer Article on January 13, 1990 which referred to this sentencing.

I am placing Mr. Bogas on probation for four (4) years.

The defendant shall abide by the standard conditions of probation adopted by this Court, Local Criminal Rule 10.05, and the following special conditions:

1) During the first 180 days of supervision, beginning February 26, 1990, the defendant shall participate in a home detention program as directed by the probation officer. The probation officer is to make arrangements with the Community Re-Entry Program of Cleveland. The cost of the program, $15 per day, shall be paid by the defendant. During the period of home detention, the defendant is to remain at his home, except to perform community service and for medical treatment.

2) Defendant is to perform 1,000 hours of community service as approved by the probation officer.

The community service is to be completed as follows:

During the 180 days of home detention the defendant is to perform 600 hours of community service, at a rate of not less than 100 hours per month.

During the remaining three and one-half years of probation, the defendant is to perform 400 hours of community service at a rate of not less than 75 hours every six months.

There is no fine imposed, but there is a required $50.00 penalty for each count, for a total of $100.00, pursuant to § 3013. The defendant cannot appeal his conviction; both the defendant and the government may appeal the sentence, upon ten (10) days notice to the Clerk of Court.

The government's motion to dismiss counts 1, 3, and 4, is granted.

IT IS SO ORDERED.