**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**William N. BOGAS,**
**Defendant–Appellee.**

No. 90–3228.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 12, 1990.

Decided Dec. 3, 1990.

Gregory C. Sasse, Asst. U.S. Atty., Cleveland, Ohio, Barry M. Hartman (argued), Anne S. Almy, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for plaintiff-appellant.

Bernard J. Stuplinski (argued), Kahn, Kleinman, Yanowitz & Arnson, Nicholas M. DeVito, Cleveland, Ohio, for defendant-appellee.

Before WELLFORD and NELSON, Circuit Judges, and MEREDITH, District Judge.[*]

DAVID A. NELSON, Circuit Judge.

This is an appeal by the government from a sentence imposed on a former municipal official who pleaded guilty to charges of (a) not reporting the release of ignitable hazardous wastes into the environment and (b) making a false statement about the release. As calculated by the district court under the United States Sentencing Commission's *Guidelines Manual* (Nov.1989), the offense level for the defendant's crimes was not high enough to require imprisonment; the defendant was sentenced instead to a combination of community service, probation, and home detention. The district court explained its decision in a comprehensive sentencing memorandum reported at 731 F.Supp. 242 (N.D. Ohio 1990).

The government raises two questions on appeal: (a) whether the offense level ought to have been increased under U.S.S.G. § 2Q1.2(b)(1)(B) because, although the district court found no "actual environmental contamination" of any significance (see Application Note 5), the offense "involved a discharge, release, or emission of a hazardous or toxic substance;" and (b) whether the offense level ought to have been increased under U.S.S.G. § 2Q1.2(b)(3) because "cleanup [of the released substance] required a substantial expenditure."

We conclude that the offense level ought to have been increased under both subsections. Whether a sentence of imprisonment is necessary, however, remains to be seen. A major purpose of application notes such as the one on which the defendant relies here is to "provide guidance in assessing the reasonableness of any departure from the guidelines." U.S.S.G. § 1B1.7. Because of the manner in which it calculated the offense level, the district court saw no need to consider a downward departure based on Application Note 5 or on any of several other factors that might have justified such a departure. The court will have an opportunity to consider this on resentencing.

I

In 1954, after military service in the Korean War, defendant William M. Bogas went to work for the City of Cleveland as a mechanic. He retired 34 years later as the Commissioner of Cleveland Hopkins International Airport, a facility for which Mr. Bogas had day-to-day operational responsibility.

---

[*] The Honorable Ronald E. Meredith, United States District Judge for the Western District of Kentucky, sitting by designation.

Early in 1988, not long before his retirement, Mr. Bogas initiated a cleanup operation at the airport. Empty paint drums, damaged snow fencing, and broken sewer pipe and other construction debris had accumulated on the airport property, and it was decided that the best way to get rid of this material would be to bury it. Selecting an isolated location in the "clear zone" at the end of a runway, Mr. Bogas had a bulldozer operator dig a large disposal pit there. The pit, as Mr. Bogas testified at his sentencing hearing, was about eight or nine feet deep, 50 feet wide, and 100 feet long.

Into the pit, on March 10, 1988, went the rubbish described above. Although Mr. Bogas believed that the paint drums were empty, as the district court found, some, unfortunately, were not. The quick-drying oil-based paint used for maintaining airport runway stripes sometimes turned lumpy as it was being applied, and partially filled drums of bad paint—augmented, on occasion, with residue from a painting truck— had been capped and commingled with drums that were empty.

Locked in an airport garage, moreover, were several drums containing dirty solvents. The solvents consisted mainly of xylene, used for cleaning the painting truck tank, and toluene (a paint thinner), used to clean painting tips and nozzles. On March 11, as we surmise, these drums of liquid waste were dumped in the disposal pit also, along with jet fuel additives and other questionable materials.

Mr. Bogas denied that he was the one who had ordered the liquid waste dumped in the pit. He testified, on the contrary, that he had specifically directed that the barrels in question be left in storage at the garage. "Under Bogas' theory," as the government's appellate brief explains, "he was the official in charge of the airport who found out after the fact that hazardous wastes had been deposited in the pit and who attempted ineffectually to cover up the facts for a short period of time." The district court credited the Bogas scenario, finding the defendant's testimony "forthright" and "sincere." The govern-

ment has accepted the court's factual determination for purposes of this appeal.

Anonymous tips led fire department and state and federal environmental protection agents to investigate the disposal pit. Mr. Bogas was cooperative, or seemed to be, but on March 15, 1988, in conversing with an official of the United States Environmental Protection Agency, he stated that eight to ten empty water-based paint drums were the only drums in the pit. This was a deliberate falsehood. Mr. Bogas knew that over 100 drums had been buried there, and he knew by this time that some of them contained paint thinner and other liquid waste. (Mr. Bogas testified that not until March 17 did he learn that not all of the drums were empty; as we shall see, this testimony appears inconsistent with the guilty plea.)

A representative of the Ohio EPA told Mr. Bogas that the waste material would have to be exhumed, and Bogas asked the contractor that had dug the pit to reopen it with a backhoe. When the top layer of earth was removed, the stench prompted the EPA to insist that the work be done by a certified hazardous waste operator. Mr. Bogas then engaged an approved waste disposal contractor, whose operations were monitored by a private technical assistance team brought in by the EPA.

As the excavation work progressed, onsite testing of the air disclosed the presence of volatile chemicals. The workers were therefore obliged to use self-contained breathing equipment similar to that worn by scuba divers.

Slowed down by heavy rains, the workers took 11 days to complete the job. During this period they pumped some 20,000 gallons of rainwater out of the pit. Tests showed that the water was not significantly contaminated, and an Ohio EPA official allowed it to be disposed of through the regular sewer system.

No contamination of drinking water was shown to have occurred. Fortuitously, as a defense expert explained, a large quantity of carbon-bearing foundry sand happened to be buried in a location where it would filter out whatever contaminants might

otherwise have gone into a nearby water-course.

Soil samples taken from the disposal pit itself were only minimally contaminated, according to this expert. He testified, moreover, that it was impossible to tell the extent of background contamination caused by partially oxidized or unoxidized fuel discharged over the years by planes landing and taking off over the clear zone.

Small quantities of toluene (one part per million) were detected in the soil, but this concentration was not dangerous, according to the government's principal expert witness. Although cadmium and lead were also detected in the soil, the government's expert testified that the concentrations of these metals were not dangerous either, as long as the soil was not ingested or inhaled. A red colored jet fuel igniter did produce some visual contamination of the soil.

The excavation of the pit unquestionably caused a release of volatile substances (toluene, *e.g.*) into the atmosphere, and the government expert testified that at high enough levels, and with long enough exposure, toluene can cause brain damage "in extreme cases." [1] Thanks to the breathing apparatus, perhaps, it does not appear that any of the workers at the disposal pit was harmed by exposure to toluene.

Some of the liquids buried in the pit were deemed hazardous as "ignitables." The record is not clear on what the danger of fire might have been when the pit was covered with earth, and there has been no suggestion that any fire actually occurred.

On October 4, 1988, a grand jury handed up a five-count indictment charging Mr. Bogas with various violations of the environmental protection laws and regulations. Mr. Bogas eventually pleaded guilty to Counts 2 and 5 of the indictment, and the government dismissed Counts 1, 3 and 4.

Count 2 charged Mr. Bogas with a violation of 42 U.S.C. § 9603(b)(3). On or about March 10 and 11, 1988, this count averred, while having knowledge of the release into the environment of more than 100 pounds of ignitable hazardous waste without a federal permit, Mr. Bogas failed immediately to notify the appropriate federal agency of the release, notwithstanding that he was the person in charge of the facility from which the release occurred.

Count 5 charged a violation of 18 U.S.C. § 1001. The averment was that on or about March 15, 1988, in a conversation with Edward Burk of the federal EPA, defendant Bogas represented that eight to ten empty water-based paint drums were the only drums that had been put in the disposal pit, notwithstanding that Mr. Bogas knew at the time that over 100 drums, some of which contained toluene and other liquid wastes, had been buried there.

After the guilty pleas had been accepted, a probation officer prepared a presentence report for use by the district judge. Among other things, this report presented a narrative account of the defendant's "offense conduct;" suggested that a total offense level of 24 was assignable to such conduct under the guidelines; noted that the defendant had no criminal history, and thus belonged in Criminal History Category I; and reported that under the sentencing table set forth in Chapter Five of the guidelines, the combination of Criminal History Category I with a total offense level of 24 calls for a sentence of imprisonment in the range of 51–63 months. The report then went on to analyze certain factors (including a lack of training and supervision of Bogas by his superiors) that might arguably warrant a downward departure from this range. The defendant filed written objections to the report, challenging some of the factual assertions and several aspects of the proposed method of applying the guidelines. The district court conducted an evidentiary hearing to resolve the matters in dispute.

The evidence presented at the hearing included, in addition to that already alluded to, testimony and exhibits relevant to the

---

**1.** In the interest of full disclosure, we note that two of us on the panel worked, as young men, in factories where we were exposed to toluene on a daily basis. The reader may draw whatever inferences seem appropriate.

question whether "cleanup required a substantial expenditure." (Under U.S.S.G. § 2Q1.2(b)(3), an affirmative answer to this question necessitates a four-level increase in the offense level.) The government put the required cleanup cost at $350,000, and the defendant put it at $10,300.

The district court accepted the defendant's figure and held that the expenditure required for cleanup was not "substantial." Having also accepted the defendant's contention that no offense level increase was required by reason of the discharge of a hazardous substance, and having rejected certain portions of the probation officer's recommendations not at issue on appeal, the district court concluded that the appropriate offense level was only 10.

At this level, the manual's sentencing table calls for imprisonment for 6–12 months. Where the minimum term of imprisonment is not more than six months, however, U.S.S.G. § 5C1.1(c) permits the minimum term to be satisfied by a sentence of probation in which home detention is substituted for imprisonment.

Exercising its option under § 5C1.1(c), the court placed defendant Bogas on probation for four years, with a requirement that he participate in a home detention program for the first six months. Mr. Bogas was ordered to pay the cost of his home detention ($2,700), plus $100 ($50 per count) in special assessments. Finally, he was ordered to perform 1,000 hours of community service.

The government contends that this sentence (which it characterizes as "far too low") resulted from an incorrect application of the sentencing guidelines. Accordingly, with the personal approval of the Solicitor General, the government perfected an appeal under 18 U.S.C. § 3742(b)(2).

## II

■ The first step in applying the guidelines is to determine which section in Chapter 2 of the manual (captioned "Offense Conduct") applies to the offense of which the defendant has been convicted. See U.S.S.G. §§ 1B1.1(a) and 1B1.2(a). Multiple-count convictions sometimes make this difficult, but because the parties in this case agreed that the counts to which Mr. Bogas had pleaded guilty involved "substantially the same harm" within the meaning of U.S.S.G. § 3D1.2, the district court properly treated both counts as a single group. The offense level for the group is the offense level for the more serious count. See § 3D1.3(a). The more serious count, it is agreed, is Count 2 (failure to report to EPA).

The statutory index in Appendix A of the manual indicates that the section in Chapter 2 that applies to a violation of 42 U.S.C. § 9603(b), the offense charged in Count 2, is § 2Q1.2, a section entitled "Mishandling of Hazardous or Toxic Substances or Pesticides; Recordkeeping, Tampering, and Falsification." The base offense level specified in § 2Q1.2 is level 8.

If the offense is one that "involved" a non-repetitive discharge or release of a hazardous substance, as § 2Q1.2 goes on to provide in subsection (b)(1)(B), the offense level is to be increased by 4. The subsection is couched in the imperative ("increase by 4 levels," it directs), and no distinction is drawn between a case where the defendant actually caused the release and a case where he simply failed to report it. Neither does the subsection differentiate between a release that results in actual environmental contamination and a release that does not. If there were nothing more, therefore, a four-level increase would clearly be mandatory in this case, absent a "departure," regardless of whether the disposal of the ignitable wastes was in violation of Mr. Bogas' instructions, and regardless of whether it resulted in any actual environmental contamination.

But there is more. The official "Commentary" on § 2Q1.2 does not differentiate among the wide variety of ways in which an offense might have "involved" a hazardous substance discharge, but the commentary does say, in Application Note 5, that "Subsection (b)(1) *assumes* a discharge or emission into the environment resulting in *actual environmental contamination.*" (Emphasis supplied.)

Application Note 5 continues as follows:

"A wide range of conduct, involving the handling of different quantities of materials with widely differing propensities, potentially is covered. Depending upon the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation, a departure of up to two levels in either direction from the offense levels prescribed in these specific offense characteristics may be appropriate."

The district court did not find it necessary to consider the latter part of Application Note 5, given the flat statement in the introductory sentence that subsection (b)(1) "assumes a discharge resulting in actual environmental contamination." In a case where the government has not shown the assumed fact to be present, the court decided, subsection (b)(1) does not warrant any increase at all.

The court's reading of subsection (b)(1) and Application Note 5 was erroneous, we believe. The commentary accompanying a particular guideline section often illuminates the intent of the section's drafter, as the commentary accompanying U.S.S.G. § 1B1.7 explains, but nothing in the manual suggests that the express command of a guideline section may be countermanded by the commentary.

What the commentary may do, as § 1B1.7 states, is "suggest circumstances which, in the view of the Commission, may warrant *departure* from the guidelines." (Emphasis supplied.) "Departure," in this context, is a term of art developed by the Commission as a shorthand way of referring to the exercise by a sentencing court of its statutory authority to impose a sentence outside the range prescribed by the Commission's guidelines. See *Guidelines Manual*, pages 1.6 and 1.7, under the heading "Departures." Authority to depart from a specified sentencing range may only be exercised where the court finds "an aggravating or mitigating circumstance ... not adequately taken into consideration by

the Sentencing Commission," 18 U.S.C. § 3553(b), so it can be very helpful, obviously, for the Commission to explain, in its commentary or elsewhere, precisely what circumstances it took into consideration.[2]

The Commission has distinguished between departures for which the Guidelines provide "specific guidance" and departures that are "unguided." See *Guidelines Manual*, page 1.7. The latter part of Application Note 5, following § 2Q1.2(b)(1), gives "specific guidance" when it suggests that a one or two level departure from the prescribed offense level may be appropriate depending on the harm resulting from the discharge or release. Perhaps an "unguided" departure in excess of two levels could be appropriate in a situation where no actual environmental contamination occurred, the Commission having strongly suggested in the first sentence of the application note that a complete absence of actual environmental contamination was a circumstance not taken into consideration in the drafting of subsection (b)(1).

We need not decide the issue here, for it would be clearly erroneous, on this record, to find no actual environmental contamination. There may have been no actual harm, but there was at least some visual contamination of the soil at the disposal site, there was readily detectable contamination of the atmosphere above the disposal site, and there must have been some water contamination even if the fortuitous presence of the nearby foundry sand filter prevented any possible damage to anyone's water supply.

On remand, the district court may wish to consider an "unguided" departure based on a finding that the Commission did not adequately take into consideration the difference in culpability between one who directs that a hazardous substance be improperly released into the environment and one who, having directed just the opposite, fails to make an immediate report after learning that the fat got put in the fire

---

**2.** Although the statute speaks only of going outside the sentence "range" prescribed by the guidelines, the Commission speaks both of departures from the range and departures from the rules by which the range is determined. We shall use "departure" in both senses too.

anyway. We are not prejudging the appropriateness of such a departure, of course, and we note that a departure on this basis should not even be considered by the district court if, on further reflection, the court should find that it has any serious doubt about the truth of Mr. Bogas' claim that he never directed his people to take the liquid wastes out of the locked garage and put them in the disposal pit. (Although the government has the burden of proving contested facts necessary to support an offense level increase, see *United States v. Silverman,* 889 F.2d 1531, 1535 (6th Cir.1989), the burden of persuading the sentencing court that a downward departure is warranted rests with the defendant. The court, moreover, must state the "specific reason" for any departure. See 18 U.S.C. § 3553(c)(2); U.S.S.G. § 5K2.0; *United States v. Gill,* No. 89–6535, slip op. at p. 6 (6th Cir. June 12, 1990).) [904 F.2d 708 (table)]

## III

■ U.S.S.G. § 2Q1.2(b)(3) provides that "[i]f the offense resulted in disruption of public utilities or evacuation of a community, or if cleanup required a substantial expenditure, increase by 4 levels." Application Note 7 provides:

> "Subsection (b)(3) provides an enhancement where a public disruption, evacuation or cleanup at substantial expense has been required. Depending upon the nature of the contamination involved, a departure of up to two levels either upward or downward could be warranted."

The government requests only a two-level increase here, thereby conceding the appropriateness of a two-level departure from the four-level increase.

■ Under the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), the cost of cleaning up hazardous waste sites is to be borne by those responsible for the wastes. Cleanup costs recoverable under CERCLA include not only the direct cost of removal,

but of site testing, studies, and similar "response costs," direct and indirect. *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1500–1502 (6th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990). Although actions brought under CERCLA are civil in nature, the extent to which cleanup costs are recoverable under CERCLA provides a useful measure of the cleanup expenditures to be taken into account under U.S.S.G. § 2Q1.2(b)(3).

Although there appear to be a few soft spots in the government's proof as to the legitimate cleanup costs actually incurred in this case, it is clear from the record that such costs greatly exceeded $10,300. The latter amount was merely an estimate—by a non-certified contractor—of what it would cost for him physically to excavate the pit. The estimate leaves out a great deal, including the cost of disposing properly of the excavated material, the cost of protective measures for the workers, and the cost of testing to find out what substances the workers were dealing with. There is no basis for supposing that such cleanup costs were not actually "required" —and as far as the need for tests is concerned, it is worth remembering that Mr. Bogas admits that he lied to the EPA about what was really in the pit.[3] Having reviewed the cost data carefully, we are satisfied that the expenditure of tax dollars required for the cleanup came to a six-figure total. The finding that cleanup did not require a "substantial" expenditure was clearly erroneous.

The case is REMANDED to the district court for resentencing.

WELLFORD, Circuit Judge, concurring.

I would find in this case, in view of the entry of a guilty plea submitted by defendant Bogas, and as testified by the plaintiff's expert, that very high HNU readings were obtained from a number of barrels buried in the pit and exhumed by a proper

---

**3.** In making this obvious point, we do not intend to rule out the possibility of a downward departure based on factors such as those discussed in the presentence report; we intimate no opinion one way or the other on that question.

order of the EPA. It is also undisputed that significant organic and potentially toxic wastes were in the air at the site requiring workmen to wear masks and protective equipment. Defendant, it must be remembered, pled guilty to "unauthorized *release* of *hazardous* waste *into* the environment," (emphasis added) and to making "false statements to a government agency." I cannot agree with the factual recitation by the majority that the existence of foundry sand nearby the site "would filter out whatever contaminants might otherwise have gone into a nearby water course." It was Dr. Coburn's opinion that foundry sand fill would "significantly filter" hazardous materials which might flow through in the Abrams Creek watercourse area. We do not know whether contaminants were entirely cleaned out or not. Dr. Coburn could not say whether or not any "significant amount of contamination" resulted from an over-all perspective. I cannot agree, furthermore, from the proof, and the guilty plea, that there was no "possible damage" to anyone's water supply as a consequence of defendant's actions.

I concur fully in the conclusion that it was clear error for the district court to find "no actual environmental contamination." In the first place, defendant's guilty plea conceded *release* of hazardous waste into the atmosphere and the surrounding soil ("the environment"). Furthermore, it was erroneous of the district court not to acknowledge that undisputed proof established a basis for that guilty plea even though no actual harm may have been demonstrated, or even have been detectable, at the time of the sentence hearing. There was unquestioned serious *risk* of harm to the environment, and to persons involved in the clean-up, by reason of defendant's admitted actions in causing the release.

I further agree that the burden is upon the defendant to establish a basis for any downward adjustments to the offense level and any departure from guideline levels. *United States v. Silverman*, 889 F.2d 1531, 1535 (6th Cir.1989); *United States v. Brewer*, 899 F.2d 503 (6th Cir.1990). "Subsection (b)(1) (U.S.S. 6 § 2Q12(b)(1)) *assumes* a discharge or omission into the environment resulting in actual environmental contamination." (Commentary application Note 5, emphasis added). The district court was in error in equating "actual" with "significant" contamination.

I am fully in agreement with the majority determination of clear error in the district court's findings about cost of the required clean-up. A six-figure total is, indeed, indicated, and it was simply wrong for the district court to disregard the estimates of cost furnished by EPA and city officials to do the job. I would emphasize that any reference to a departure in this case is simply in explanation of the potential alternatives available to the district court on remand primarily in deciding an appropriate base offense level in this case. Departure from prescribed sentencing level must also be substantially and clearly justified by the district court. *See United States v. Brewer, supra.* In sum, our decision and remand for further sentencing should not be interpreted in any fashion as indicating that a downward departure would be either appropriate or reasonable.