**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Sienky LALLEMAND, Defendant–Appellant.**

No. 92–2178.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1993.

Decided March 29, 1993.

peared, from their dress and cars, to have money. He was unemployed and decided that blackmailing a married homosexual would be a good way of raising money to help defray the expenses of his wife's pregnancy. One day, while his wife was at work, he concealed a video camera trained on a mattress in the living room of their apartment. He then went to the forest preserve, and was approached by a man driving a Honda. They talked, and when the defendant discovered that the man was married he invited him to his apartment, where they engaged in a sexual act that was recorded by the concealed camera. They then parted.

The man's car had an Indiana license plate. The defendant took down the number on the plate and was able with his wife's assistance to obtain the name and address of the prospective blackmail victim from the Indiana Bureau of Motor Vehicles. The defendant and his friend Jackson began following the victim and his family, verified that he was married, and found out where he worked. The defendant then mailed a copy of the videotape to the victim at his office, with a demand that he leave $16,000 in a locker in a shopping mall. When the demand was not met, the defendant sent another letter to the victim, repeating the demand and fixing a new date for the drop off of the cash—and at the same time mailed another copy of the tape, this time to the victim's home, in Gary, Indiana, where it was opened by his wife. The victim then called the FBI.

Andrew B. Baker, Jr., Asst. U.S. Atty., Dyer, IN (argued), for plaintiff-appellee.

Mark A. Thiros, Merrillville, IN (argued), for defendant-appellant.

Before CUDAHY, POSNER, and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

The defendant pleaded guilty to extortion and was sentenced to 18 months in prison. His appeal presents interesting questions concerning the application of the federal sentencing guidelines.

The defendant lived in Calumet City, Illinois, near a forest preserve that he knew was frequented by homosexuals who ap-

Several days earlier the defendant had given Jackson a briefcase containing the master tape and drafts of the blackmail letters. According to evidence that was contested but which the district judge was entitled to and did believe, the defendant told Jackson to destroy the briefcase and its contents in the event that the defendant was arrested.

When the defendant went to pick up the cash on the date fixed in his second blackmail letter, the FBI was waiting and arrested him. He confessed forthwith, consented to a search of his home, and called Jackson to tell him not to destroy the briefcase and

its contents after all—but Jackson had already destroyed the contents, although it is not clear exactly when he did so. Jackson was not charged with any crime.

The victim of the blackmail attempt, a government employee who had two adult children and was active in church and civic affairs, attempted suicide after, and apparently because of, the attempt.

Sentencing under the guidelines begins with the "base offense level," that is, the base level for a specified offense or group of offenses. For "blackmail and similar forms of extortion," punished mainly by 18 U.S.C. § 873, the base offense level is 9. U.S.S.G. § 2B3.3(a). After the base offense level is determined, adjustments are made for the presence of aggravating and mitigating factors. When the process of adjustment is complete, the sentencing range is read off from the sentencing table, a matrix of offense levels and criminal histories; and the judge then picks a sentence within the range unless he decides to make an upward or downward departure. Among the adjustments made here that yielded the final offense level of 14 (which translates into a sentencing range of 15 to 21 months for a first offender, as this defendant was) were two 2–level increases, for obstruction of justice and particularly susceptible victim, respectively, and a 2–level reduction for acceptance of responsibility. The defendant challenges the two increases; the government does not challenge the reduction.

■ We begin with the obstruction of justice. An upward adjustment is required "if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." § 3C1.1. The defendant makes two arguments. The first is that this provision cannot apply because as soon as he was arrested he began to cooperate with the government, for which he was duly rewarded with a 2–level reduction for acceptance of responsibility. That is not a persuasive argument. The act constituting an obstruction or attempt to obstruct occurred before his arrest, when he told his accomplice to destroy incriminating evidence if he was arrested. The acts constituting acceptance of responsibility did not begin until he was arrested. You can have the act of obstruction or attempt to obstruct at time it, and the acceptance of responsibility at time $t + 1$. There is no logical or practical incompatibility, and no barrier in the language of the guidelines. An application note, moreover, indicates that while "ordinarily" a finding of obstruction of justice precludes a finding of acceptance of responsibility, there may be "extraordinary cases in which [both] adjustments ... may apply." U.S.S.G. § 3E1.1, Application Note 4. The present case is an even stronger one for offsetting obstruction and acceptance adjustments than *United States v. Bogas*, 731 F.Supp. 242, 250–52 (N.D.Ohio 1990), where the judge increased the defendant's sentence because of an obstruction of justice, while granting him a downward adjustment for acceptance of responsibility because the defendant had cooperated with the authorities before and after making the false statement constituting the obstruction.

■ The defendant's second argument concerning obstruction of justice is that, to be used to enhance a sentence, the obstruction must occur during the investigation, prosecution, or sentencing, whereas here the order to the accomplice came before the investigation began. It is true that the obstruction, whether attempted or completed, must by the terms of the guideline be obstruction of the investigation, prosecution, or sentencing. But it can be set in train before the investigation begins. Suppose the defendant had told Jackson that in the event the victim went to the authorities Jackson was to kill the victim and any other witnesses. That order would be an attempt to obstruct justice, because the actual obstruction, if it occurred, would disrupt the investigation. Moreover, if Jackson committed an actual obstruction of justice by destroying the contents of the briefcase after the FBI's investigation began (and it seems he did, although the chronology is unclear), then the defendant was his accomplice and therefore was him-

self guilty of obstructing justice during the investigation.

■ The more difficult question presented by the appeal is whether Lallemand's victim, by virtue of being a married homosexual, could as the district court determined be thought "unusually vulnerable due to age, physical or mental condition, or ... otherwise particularly susceptible to the criminal conduct." § 3A1.1. The guideline requires that the defendant know or have reason to know that his victim is unusually vulnerable or particularly susceptible, as the case may be ("particularly susceptible" is the term applicable to this case, since being a married homosexual is not aptly described as a physical or mental condition). That requirement is satisfied here, provided a married homosexual is by virtue of that status particularly susceptible to blackmail, because the defendant knew that his victim was married and that he engaged in homosexual sex.

■ The purpose of an upward adjustment is to take account of an aggravating factor not already taken into account in the base offense guideline. Otherwise there would be double counting. The guidelines do not authorize double counting, *United States v. Lamere*, 980 F.2d 506, 516 (8th Cir.1992)—not generally, at any rate, for like most legal generalizations this one has exceptions. For example, a judge is allowed to use a factor taken into account in a guideline to justify an upward departure from the guideline. U.S.S.G. § 5K2.0; *United States v. Aimufua*, 935 F.2d 1199 (11th Cir.1991) (per curiam). But that is not a consideration in this case.

There are fewer offense guidelines than there are offenses; and if the guideline covers a wide range of offenses, as does § 2B1.1, which assigns a base offense level of 4 to larceny, embezzlement, and other forms of theft, it may be possible, without double counting, to apply an upward adjustment to all perpetrators of a particular offense. For example, all postal carriers who steal mail might be thought to have abused a position of trust (§ 3B1.3), because § 2B1.1 lumps together in base offense level 4 forms of theft that do with forms of theft that do not involve an abuse of a position of trust. Since nothing in the guideline itself adjusts for this aggravating factor, postal carriers who steal mail would be underpunished if the adjustment for abuse of trust were confined to cases in which the defendant was more culpable than others who had committed the same *crime*, as distinct from others who had committed offenses within the same *guideline*.

However, unlike the guideline applicable to theft, the guideline applicable to blackmail is narrow. It is limited to blackmail itself, whether charged under the blackmail statute or under an extortion statute, and to other forms of extortion that do not involve a threat of force or the abuse of an official position, such as a railroad employee's threatening to delay a critical shipment. § 2B3.3(a). The guideline does not cover all forms of extortion, a miscellaneous category of offenses that includes blackmail but also theft by threat of force and shakedowns by public officials. 18 U.S.C. §§ 872, 875(b); U.S.S.G. §§ 2B3.2, 2C1.1. So we have a guideline that although not limited to blackmail is dominated by it (the guideline is entitled "Blackmail and Similar Forms of Extortion"). The base offense level assigned to it should therefore probably be assumed to take account of the typical features of the offense—of which the vulnerability or susceptibility of the victim might be thought to be one. Cf. *United States v. Newman*, 965 F.2d 206, 211 (7th Cir.1992). No one blackmails someone whom he does not consider susceptible in the sense of having a secret that he would very much like to conceal. Secrets concerning sexual behavior are among the secrets that people often want very much to conceal.

We do not know how many persons sentenced under the "Blackmail and Similar Forms of Extortion" guideline are guilty of blackmail rather than of other forms of extortion that may not involve victims as susceptible as typical blackmail victims are. If the vast majority are guilty of blackmail, it would be odd to make a susceptible-victim sentence enhancement in every

blackmail case. It would suggest that the Sentencing Commission had erred in placing blackmail and the other forms of extortion in the same guideline, in which they would carry the same base offense level— had placed together classes of offender that, because one preys on unusually vulnerable or otherwise particularly susceptible victims and the others do not, were of systematically different gravity and should have different base offense levels. Earlier we said that the base offense guideline for theft may do just this—lump together offenses of different gravity and leave it to the adjustment guidelines to make the necessary distinctions. But we also said that the theft guideline covered many offenses, and the blackmail guideline covers very few; and the fewer the covered offenses, the more homogeneous the offense category is likely to be.

We need not pursue the issue further. It is enough for the decision of this case to observe that drawing distinctions within the class of blackmail victims (as distinct from the broader class consisting of all offenses within the "Blackmail and Similar Forms of Extortion" guideline) is both feasible and proper. Blackmail victims are not all susceptible to the same degree. Some secrets are a good deal more painful than others. A married homosexual or bisexual is likely to be deeply "closeted"; to have not only a wife, but children, who are ignorant of his sexual proclivity. Exposure threatens his marriage, his relationship with his children, and his status in the heterosexual milieu that he by preference inhabits by virtue of his closeted state. In American society, much of which is intolerant of homosexuals outside of the particular occupations and enclaves in which they are common and "out," the revelation that a married man has a secret life of homosexual behavior can have a shattering effect, illustrated by the suicide attempt by the defendant's victim. Of course the defendant did not foresee a suicide attempt. But the fact that he targeted married homosexuals, and the size of the demand that he made of the victim in this case, indicate a malevolent focusing in on a particularly susceptible subgroup of blackmail victims.

It should go without saying that the characteristics which make a victim unusually susceptible to a particular offense need not be ones wholly idiosyncratic to him; they can be shared with others. *United States v. Salyer*, 893 F.2d 113, 116 (6th Cir.1989).

The guideline providing for a longer sentence when there is an unusually vulnerable or particularly susceptible victim appears to have a twofold purpose. One, the practical, is to recognize the lower cost to the criminal of committing a crime against such a victim than against a victim of ordinary robustness. A vulnerable or susceptible victim is (1) less likely to defend himself, (2) less likely perhaps to be aware that he is a victim of crime, (3) less likely to complain. The first and third of these factors are likely to be present when a blackmailer picks on a married homosexual. The guideline's other purpose, the moralistic, is to express society's outrage at criminals who unsportingly prey on the weak, the defenseless. It is one thing for a blackmailer to hound a person who hasn't paid his taxes, or is stealing from his boss, or is cheating—in the usual way—on his wife. These are commonplace forms of misconduct, and while their exposure can impose psychic as well as economic and other forms of tangible harm, it is not so shattering as the revelation of the double life of the married homosexual. To hound a person furtively engaged in sexual activities that he, his wife, his children, his parents, and his friends may consider deeply shameful, disgraceful, abnormal, or vicious is to exploit a position of unusual leverage in relation to one's victim that deserves recognition in sentencing. To the argument that government ought not use the criminal laws to protect the privacy of people who engage in conduct that rightly or wrongly is an object of social reprobation, it is a sufficient answer that the law against blackmail proceeds upon virtually the opposite premise.

AFFIRMED.

RIPPLE, Circuit Judge, concurring in the judgment.

I agree with the majority that the district court acted well within the bounds of its

discretion in enhancing the defendant's sentence for obstruction of justice. I also agree that the crime committed by the defendant was particularly vicious and deserves an additional enhancement of the punishment. My only disagreement with my brothers is with respect to their approval of the methodology employed by the district court in imposing this enhancement. In my view, rather than distort the vulnerability enhancement in a way that can only pose significant difficulties in future cases for the district courts, we should hold that the applicable guideline does not take adequately into consideration the harm caused by this case and that the district court could have departed upward. *See* U.S.S.G. § 5K2.0 (Policy Statement). Such an approach would leave the vulnerability enhancement intact and permit its principled application in future cases. It would also permit the sentencing process in this case to reflect more accurately the damage inflicted by the defendant's actions.

A blackmail victim may, of course, be vulnerable in ways that would warrant an enhancement for vulnerability—age, mental infirmity, or other handicap that would prevent the normal resistance to blackmail activity. Here, however, the enhancement is justified by the majority on the type of secret and on the degree of potential harm because of the nature of the secret. As the majority quite frankly points out, blackmail requires vulnerability because the victim must have a secret that, if generally disclosed, would be of significant detriment to him. Unless the victim is vulnerable in that sense, the crime cannot succeed. Therefore, as the majority concedes, an enhancement for vulnerability is not generally appropriate in blackmail cases. In its view, however, this case warrants different treatment because the nature of the secret here produces a greater harm than that suffered by other blackmail victims.

The difficulty in dealing with the problem in such general terms is not hard to discern. While the allegation made against the victim certainly produces a stigma that cannot be, and should not be, understated, it is somewhat more debatable as to wheth-er such an allegation ought to be placed in a category by itself. The pattern of conduct of the victim, while clearly sanctionable under the law, *see Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), is still a condition that we understand very dimly. Certainly, there are other allegations involving moral turpitude that many would consider equally damaging. Moreover, it is really a sweeping generalization to suggest, as my brothers do, that *all* men who are married and who are accused of this conduct would experience a trauma of a magnitude very much more severe than other victims. Certainly, the trauma experienced by those in public life or in clerical roles or in education (or, indeed, anyone aspiring to such responsibility) would be similar to that of the majority's stereotypical "married man." On the other hand, there may well be those who are married in name but not in fact who could not be able to claim the injury that the majority attributes to them. In short, the majority, in its effort to isolate those who would suffer particularly grievously from such an allegation, paints with a stroke that is both over and underinclusive. It deals in stereotypes, not individuals. Consequently, we are left with a holding that is without any principled limitation.

The majority finds itself in this dilemma because of its starting point. It attempts to justify the increase in the sentence by putting the vulnerability enhancement of § 3A1.1 to a use for which it was not intended. The correct methodology would be to acknowledge that the guideline section for blackmail, § 2B3.3, as presently written, does not provide adequately for situations in which the harm to the victim or to others is especially severe or in which the degree of planning suggests a criminal propensity that requires close attention. Unlike many other offense conduct guidelines, the guideline for blackmail does not provide for such contingencies by the inclusion of specific offense characteristics. Therefore, it would have been appropriate, on the facts of this case, for the district court to depart upwardly within the framework of the guidelines. Using this method-

**942**

ology, the district court could have taken into consideration not the stereotypes suggested by the majority but the *real* harm to the *real* human beings touched by this situation. It would have been appropriate to consider the great deal of planning that went into this particular blackmail, the harm to persons other than the primary victim, and the particularly severe psychological damage suffered by the primary victim.[1] Had the district court followed this approach, or had the majority of this court adopted it, we would have a vulnerability enhancement still capable of principled application. The district courts of this circuit would also realize that the present blackmail guideline is inadequate to meet the needs of law enforcement and that, until the Sentencing Commission amends the provision to reflect the realities of criminal practice, upward departures will often be required.

I cannot join what I believe to be an erroneous and short-sighted approach to this aggravated blackmail situation. In most situations, the erroneous application of the guidelines requires that we remand the case for resentencing. However, because, under the approach I believe to be correct, the district court would have imposed at least the sentence it did, I also would affirm the judgment of the district court. *See Williams v. United States,* —— U.S. ——, —— – ——, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992) ("[O]nce the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless[.]").

---

**1.** "[A] factor may be listed as a specific offense characteristic under one guideline but not under all guidelines. Simply because it is not listed does not mean that there may not be circumstances when that factor would be relevant to sentencing." § 5K2.0 *Grounds for Departure* (Policy Statement).