# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2027

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Missouri. |
| | * | |
| Ronald Jackson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 14, 2011
Filed: May 9, 2011

_____

Before WOLLMAN, LOKEN, and SMITH, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Ronald Jackson, formerly a police officer with the St. Louis, Missouri, police department, pleaded guilty to the theft of federal-government property, a violation of 18 U.S.C. § 641. At sentencing, the district court,[1] among other things, added eight levels to Jackson's base offense level for his possession of a dangerous weapon—his duty firearm—in connection with the offense. See U.S. Sentencing Guidelines Manual (U.S.S.G.) § 2B1.1(b)(13)(B) (2009). It then added two additional levels for his role in organizing and leading the theft. See U.S.S.G. § 3B1.1(c). Jackson

_____

[1]The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri.

appeals, arguing that because his firearm played no role in facilitating the offense, and because he was not a leader, but rather was a mere "equal part[y]" with his co-defendant (another officer), the adjustments found in §§ 2B1.1(b)(13)(B) and 3B1.1(c) do not apply.  We affirm.

I.

On July 27, 2009, Jackson was on duty as a police officer when an informant tipped him off that a woman, described in the proceedings below only as "Jane Doe," was in possession of stolen electronics.  Unknown to Jackson, the "tip" had been generated by federal investigators, who suspected that Jackson had been "conduct[ing] police stops of vehicles that were supposedly containing stolen goods, [and] would then seize those items and then split those items with a third party." Sentencing Tr. at 14:13-20.  Their plan was to catch Jackson in the act.

The informant gave Doe's location to Jackson, and the two agreed that Jackson would find her, seize the electronics, and share some of them with the informant. Jackson, a 30-year officer, contacted his co-defendant Christian Brezill, an officer with only 18 months' experience, and asked if Brezill would help with the theft of the electronics.  Brezill agreed to do so, and the two drove to the location the informant had provided, where they found Doe sitting in her car.  After a computer check of her name revealed outstanding warrants for minor traffic violations, the officers arrested Doe, handcuffed her, and placed her in the back of Brezill's police cruiser.  They then searched the trunk of her car, recovering the "stolen" electronics, which they put in the trunk of Brezill's cruiser.  The officers booked Doe on the outstanding traffic warrants, but never charged her with possession of the stolen electronics and never reported their recovery to the police department.

Later, after the end of their shift, Jackson and Brezill met to divide the property.  Jackson gave part of his share to the informant, kept an XBox gaming

system for himself, and sold the rest for cash; Brezill kept a Wii gaming system and a laptop computer for himself, and sold the rest for cash. The total value of the property, all of which belonged to the United States government, was $1480.35.

Jackson and Brezill both pleaded guilty to theft of federal-government property. See 18 U.S.C. § 641. At Jackson's sentencing, the district court applied—over Jackson's objection—two upward adjustments to his base offense level. The first was for Jackson's possession of a dangerous weapon in connection with the theft. See U.S.S.G. § 2B1.1(b)(13)(B). The second was for Jackson's role in organizing and leading the offense. See U.S.S.G. § 3B1.1(c). The district court then calculated a total offense level of 15 and sentenced Jackson to 18 months' imprisonment, the low end of the guidelines range. This appeal followed.

II.

"This court reviews the district court's construction and application of the sentencing guidelines de novo, and we review its factual findings regarding enhancements for clear error." United States v. Bastian, 603 F.3d 460, 465 (8th Cir. 2010) (citation and quotation marks omitted).

Guidelines § 2B1.1(b)(13)(B) provides a two-level enhancement for "possession of a dangerous weapon (including a firearm) in connection with" a theft. Furthermore, "[i]f the resulting offense level is less than level 14," it is "increase[d] to level 14." Jackson had a base offense level of six, see U.S.S.G. § 2B1.1(a)(2), which meant that § 2B1.1(b)(13)(B) worked an eight-level increase to his base offense level.

Jackson acknowledges that he was in possession of a firearm—his duty weapon—when he committed the theft. But, he argues, there was no "nexus" between the firearm and the offense such that the enhancement found in

-3-

§ 2B1.1(b)(13)(B) could apply. In his view, that section applies only when the weapon advances the criminal enterprise, for example, by "enhanc[ing] the benefits of the offense," "mak[ing] the offense easier to commit," "inject[ing] a degree of fear," or "increas[ing] the seriousness of the crime," to name a few possibilities. And, Jackson argues, his firearm was just a necessary part of his uniform, "inconsequential" to the commission of the theft.

Section 2B1.1(b)(13)(B) requires that the possession of the weapon be "in connection with" the theft. See also U.S.S.G. § 2B1.1 cmt. background ("Subsection (b)(13)(B) implements, in a broader form, the instruction to the Commission in section 110512 of Public Law 103-322."); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110512, 108 Stat. 1796, 2019 (1994) ("[T]he United States Sentencing Commission shall amend its sentencing guidelines to provide an appropriate enhancement of the punishment for a defendant convicted of a felony under chapter 25 of title 18, United States Code, if the defendant used or carried a firearm . . . during *and in relation to* the felony." (emphasis added)).

But Jackson goes too far in arguing that his firearm was unconnected to his theft of the electronics. As the district court explained:

> While the presence of a firearm will not always warrant [application of § 2B1.1(b)(13)(B)], with regard to this case and this defendant, it's clear that the presence of defendant's firearm was not accidental or coincidental. It was available to help to deter resistance or intimidate the victim, and was available to help to protect the defendant in the event that the victim attempted to resist or harm him. In other words, the defendant used his status as a police officer with all the trappings, including the carrying of a service firearm, to commit the [theft].

Sentencing Tr. at 28:20-29:6. Indeed, it was Jackson's police uniform, which included the firearm, that cloaked him with the apparent authority to arrest Doe,

search her vehicle, and confiscate the electronics. Had he not been in uniform, it is not improbable that Doe would have regarded him as just another civilian. In those circumstances, we think it unlikely that she would have complied so readily, if at all, with his directives.

Furthermore, an officer's visible possession of a firearm, even when it remains holstered, is a signal of authority that will usually promote compliance in an ordinary citizen. Accord Florida v. Bostick, 501 U.S. 429, 448 (1991) (Marshall, J., dissenting) ("Our decisions recognize the obvious point, however, that the choice of the police to 'display' their weapons during an encounter exerts significant coercive pressure on the confronted citizen." (citing cases)). That the department required Jackson to possess the firearm as one of the "certain tools or items in order to perform and carry out his duties," Appellant's Br. at 7, only furthers that view. We therefore agree with the district court that Jackson's possession of a firearm was sufficient to support the enhancement.

## III.

Jackson's next argument—that he was not an organizer or leader for the purposes of guidelines § 3B1.1(c), but rather a mere "equal part[y]" with his co-defendant—fares no better.

Guidelines § 3B1.1(c) provides a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving fewer than five participants and that was not "otherwise extensive." See U.S.S.G. § 3B1.1 (criminal activity involving "five or more participants" or that is "otherwise extensive" is covered in parts (a) and (b)). Section 3B1.1(c) differs from § 3B1.1(a) and (b) in that it does not distinguish an "organizer or leader" from a "manager or supervisor"—both are treated to the same two-level enhancement. The background commentary explains:

In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).

U.S.S.G. § 3B1.1 cmt. background. Therefore, when considering whether § 3B1.1(c) applies, it is unnecessary to determine whether the defendant was a mere "manager or supervisor" or instead was a more responsible "organizer or leader." Still, we think that application note 4, which explains how to "distinguish[] a leadership and organizational role from one of mere management or supervision" for the purposes of § 3B1.1(a) and (b), is a helpful guide in determining whether § 3B1.1(c) should be applied to a defendant. See U.S.S.G. § 3B1.1 cmt. n.4.

That note provides:

In distinguishing a leadership and organizational role from one of mere management or supervision, . . . [f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id.

Reviewing the facts regarding Jackson's role in the offense, we conclude that the district court did not err in applying the enhancement. At sentencing, the district court heard testimony that it was Jackson who initially planned the offense, that it was Jackson who recruited an accomplice in Brezill, that Jackson was, by some three decades, the senior officer, that when the two officers found Doe it was Jackson who

"made the decision to take the property," that it was Jackson's decision to split up the property at Brezill's parents' house, and that it was Jackson who shared some of the stolen electronics with the informant. Given those circumstances, a § 3B1.1(c) enhancement was appropriate.

IV.

Jackson's final claim of error is that the district court punished him "for criminal behavior for which he was not charged," specifically, that it relied on evidence that Jackson had committed similar "rip off[s]" on numerous prior occasions. Doing so, Jackson argues, conflicted with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).

At sentencing, the government called as a witness FBI Special Agent Anthony Bernardoni, who testified that in "the spring or early summer of 2009" he had received information that Jackson had been "conduct[ing] police stops of vehicles that were supposedly containing stolen goods, [and] would then seize those items and then split those items with a third party." It was that information that led to the sting operation that gave rise to this prosecution. Furthermore, an addendum to Jackson's Presentence Investigation Report (PSR) remarked that "Jackson had engaged in this type of illegal activity for quite some time, and he purposely conducted this type of illegal business armed with a weapon in order to intimidate the victims." Addendum to PSR at 1.

Although Jackson did not object to Bernardoni's testimony (he did object to the PSR addendum), he repeatedly urged the district court not to consider any "other incidents, crimes, or alleged crimes" that had not been charged. And it seems that the district court took Jackson's objections to heart, for the record contains no indication that the district court gave any weight to Jackson's prior, uncharged conduct or that it made reference to such conduct while imposing its sentence. Rather, it noted

Jackson's "lack of a criminal history." We therefore find meritless Jackson's contention that the district court's sentence was based, even in part, on uncharged conduct.

In any event, judge-found facts regarding uncharged conduct may be considered by the district court in selecting a sentence. See United States v. Red Elk, 426 F.3d 948, 951 (8th Cir. 2005). So long as the district court treats the guidelines as advisory, as it did here, Booker is not to the contrary. See Booker, 543 U.S. at 233, 259-60; United States v. Brave Thunder, 445 F.3d 1062, 1065 (8th Cir. 2006).

V.

The sentence is affirmed.

_____