In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3245

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

GREGORY BENNETT,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06-CR-126—**Barbara B. Crabb**, *Judge.*

ARGUED OCTOBER 29, 2012—DECIDED FEBRUARY 14, 2013

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge*. On March 13, 2006, the Drug Enforcement Administration ("DEA") interviewed Gregory Bennett in connection with a series of transactions involving marijuana, MDMA (commonly known as "ecstasy"), and crack cocaine. In an attempt to induce complete truthfulness, the government, prior to the interview, agreed not to use Bennett's statements against him, provided that Bennett promised not to later

take a position inconsistent with his interview statements. During this proffer session, Bennett admitted that he had supplied all three drugs to a government informant. After the proffer interview, Bennett fled and went into hiding. A grand jury later indicted him. In 2010, Bennett was arrested living under an assumed name in Georgia. Bennett pled guilty to the possession of ecstasy and marijuana with the intent to distribute both. He now alleges that the government violated the terms of the original proffer agreement during the sentencing process, along with other subsidiary errors. We disagree. Finding no error in Bennett's sentence, we affirm the district court's judgment.

## I. BACKGROUND

On November 10, 2010, Gregory Bennett was arrested by U.S. Marshals in Georgia. Over the previous four years, Bennett had been living in Atlanta, where he had held regular employment and acquired a fiancée with whom he had a daughter. Though Bennett initially gave the arresting officer an Illinois drivers license with the name "Charles Scott," Bennett eventually admitted that the license was fake and that he was "relieved it was over." (Presentence Investigation Report at ¶ 56.) "[I]t," in this case, was Bennett's life on the run from a 2006 narcotics indictment in Wisconsin.

On January 27, 2006, Bennett and his associate, Darius Kelly, engaged the services of Amy Hill to transport drugs for them between Chicago and Madison, Wisconsin. The plan, apparently, had been for Bennett and Kelly to meet Hill in Madison that evening and retrieve the

drugs they had jointly given her in Chicago (400 ecstasy pills, 870.5 grams of marijuana, and 33.9 grams of crack cocaine). The ecstasy and marijuana belonged to Bennett, and the crack belonged to Kelly, though all of the drugs were given to Hill in one bag by both men. Kelly and Bennett had acquired the narcotics in Chicago and planned to sell them again in Madison; this was a pattern they had repeated on at least four previous occasions, each time using Hill to transport the illicit substances. Hill was hired to transport the drugs only, presumably to help Kelly and Bennett avoid detection. Bennett helped Hill arrange to rent a minivan, and he and Kelly followed two hours behind her on the drive to Madison.

Coincidentally, that same day, Hill was also hired by another individual, Quincy Clark, to transport over 180 grams of crack cocaine between Chicago and Madison. Clark, however, had been arrested earlier and had placed this order at the behest of law enforcement. After acquiring the crack cocaine to fulfill Clark's order from Lawrence Green, Hill was arrested in Madison as she attempted to meet up with Clark. Like Clark, Hill quickly agreed to cooperate with law enforcement. When Hill failed to materialize that evening, however, Bennett and Kelly became worried, and each left two voicemail messages for her before they returned to Chicago.

Back in Chicago on January 31, DEA agents prepared Hill to meet with Green, her source for the bulk of the crack cocaine she was arrested with four days earlier. The

DEA outfitted her with a recording device and $5,000 with which to pay Green. Hill met up with Green, and, after accepting payment and running errands around town in his black Hummer, Green took Hill to his cousin's house. There, Bennett and Kelly (both of whom, along with Green, were members of the Gangster Disciples street gang) intercepted Hill; they were angry that she had not met them in Madison and that she appeared to have neither their money nor their drugs (having focused on Green, the DEA had given her money to cover only his drugs). The two took Hill into the house. Bennett and Kelly directed her to strip, at which point they found the recording device. Bennett burned Hill's arms and stomach using cigarettes and cigars while demanding money for the missing drugs. Bennett and Kelly then hooded Hill with a pillowcase and took her to a new location—an abandoned house— where the assault and the demands for drug money continued. Bennett burned Hill further and beat her around the face and body.

Eventually, Hill convinced the two that a boyfriend, "Sweet Lou," had the drug money and persuaded them to call him. "Sweet Lou" was actually DEA Special Agent Lou Gade. Bennett called Special Agent Gade on Hill's cell phone and demanded the money. The two arranged a drop behind a Chicago restaurant. Bennett remained on the phone with "Sweet Lou," while Kelly went to retrieve the money. Bennett (correctly) began to suspect that "Sweet Lou" was actually a law enforcement officer and demanded that the drop location be changed. Agent Gade refused. Bennett and Kelly released

Hill later that evening, and law enforcement officers brought her to a local hospital where she was treated for the after-effects of the beating.

On March 13, 2006, Bennett, accompanied by his lawyer, engaged in a proffer session with two DEA agents—Special Agent Blake Smith and "Sweet Lou" himself, Special Agent Lou Gade. Before the interview, the government and Bennett, through his attorney, agreed to the standard conditions set out in a proffer agreement. Relevant here is the following passage:

> The government requires a completely truthful statement by your client in this proffer. In the likely event your client is subsequently prosecuted, no direct use will be made of his statements, or any information provided by him, in the government's case-in-chief at trial, or in aggravation of his sentence, pursuant to USSG § 1B1.8. . . .
>
> If your client should subsequently testify at any trial or hearing contrary to the substance of the proffer, or presents a position inconsistent with the proffer (for example, during cross-examination of witnesses, through witness testimony, or during arguments), the government is completely free to use the statements and other information from the proffer at sentencing for any purpose, at trial for impeachment or in rebuttal testimony, or in prosecution for perjury.

(R. 231-2 at 2-3.) During the interview, Bennett described his relationship with Kelly, Green, and Hill, as well as his part in the events of January 27 and 31. Importantly,

Bennett told the agents during the proffer session that he had "supplied" the drugs from the 27th to Hill: the marijuana, the ecstasy, *and* 33.9 grams of the crack cocaine. (R. 231-1 at 4.)

Bennett was indicted for various narcotics-related offenses on May 31, 2006, and an arrest warrant was issued on June 14. By that point, Bennet had fled. A superseding indictment against Bennet was subsequently handed down on October 5, 2006. While Bennett was on the run, Green, Kelly, and Hill were all convicted and sentenced for various narcotics-related offenses in connection with these events.

After being apprehended in Georgia four years later, Bennett made his initial appearance in Wisconsin on December 13, 2010, and soon entered into plea negotiations with the government. During the course of negotiations, Bennett, through his counsel, disavowed some of the proffer statements. Specifically, he said that "he did not know anything about the cocaine." (R. 231-7 at 3.) Based on the drugs he supplied to Hill, Bennett eventually pled guilty to possession of ecstasy and marijuana with the intent to distribute both. He was warned that the cocaine might still be considered "relevant conduct" at sentencing.

When it compiled the PSR, the Probation Office included a description of the information that Bennett provided during his proffer session, but noted that the information was protected. The PSR also included accounts from multiple other witnesses, including Green, Kelly, Hill, and Special Agent Gade. The Probation

Office concluded that 33.9 grams of the crack cocaine found on Hill was part of the offense conduct and used it to calculate Bennett's recommended base guideline sentence. The PSR additionally recommended a two-level enhancement for being "an organizer, leader, manager, or supervisor" of the criminal activity. U.S.S.G. § 3B1.1(c). The report did not recommend crediting Bennett for accepting responsibility for his crimes.

Bennett objected to all of these decisions. First, he objected to what he interpreted as the government's use of his proffer statements to determine his recommended sentence in the PSR. He further contended that he was not actually responsible for the cocaine and that, without the proffer statements, the government did not have enough evidence to prove that he was responsible for it. Bennett also argued that he should not receive the "organizer, leader, manager, or supervisor" enhancement. Finally, he argued that he should be credited for accepting responsibility.

The district court accepted the PSR's recommendations and overruled Bennett's objections. In doing so, the court found that Bennett's objections constituted a position inconsistent with his proffer statements; such statements breached the proffer agreement, thereby unlocking the entire content of the interview for sentencing purposes. Bennett timely appealed that decision and brings essentially the same objections before us now. We address each argument in turn below.

## II. ANALYSIS

### *A. Violation of the Proffer Agreement*

Bennett first argues that the government breached the terms of his proffer agreement. When the relevant facts are not in dispute, as here, we review the alleged breach of a proffer agreement *de novo*. *United States v. Farmer*, 543 F.3d 363, 373 (7th Cir. 2008). During this review, "[w]e hold the government to the literal terms of the [proffer] agreement, as well as the most meticulous standards of both promise and performance to insure the integrity of the bargaining process involved in proffers." *Id*. at 374 (internal quotation marks omitted).

Both parties agree that the proffer agreement was breached; we are asked to decide when and by whom. Bennett claims that the government breached the agreement when it "utilized [Bennett's] statements to determine his guideline range." (Appellant's Br. at 16.) The government, in turn, presents us with two theories for when Bennett breached the agreement, thereby making permissible the use of the proffer statements for sentencing. First, the government argues that Bennett took a position inconsistent with his proffer interview during emailed plea negotiations. Alternatively, the government claims that Bennett took an inconsistent position by arguing that he was not responsible for the crack cocaine during sentencing. Finding that any alleged government use of the proffer statements was harmless in any event, we address only that possibility.

Before talking with the DEA, Bennett accepted a proffer agreement that stated, in part:

> [t]he government requires a completely truthful statement . . . in this proffer. In the likely event [Bennett] is subsequently prosecuted, no direct use will be made of his statements, or any information provided by him, in the government's case-in-chief at trial, or in aggravation of his sentence, pursuant to USSG § 1B1.8.

(R. 231-2 at 2.) Bennett now argues that the inclusion of details from his proffer interview in the PSR constituted a "direct use" in breach of the agreement. But, the proffer was not the only agreement between Bennett and the government. Bennett also signed a plea agreement, which provided that "[t]he defendant also understands that the United States will make its full discovery file available to the Probation Office for its use in preparing the presentence report." (R. 225 at 2.) The government argues that this clause indicates that Bennett assented to the information being *included* in the PSR, and that the only limitation on the government was on *relying* on the proffer-protected statements for sentencing purposes (something the government argues it did not do).

Each party argues that *United States v. Farmer* supports its case. 543 F.3d 363. In *Farmer*, one of the defendants, Compton, entered into a proffer agreement with the government. As in Bennett's agreement, the government stipulated that it would not use the proffer information in its case-in-chief. Under paragraph five of the agreement, "the government would be free to *provide*" information from the proffer session to "any United States

District Court" if Compton pled guilty or was found guilty at trial. *Id*. at 374 (internal quotation marks omitted) (emphasis added). That provision was in some tension with paragraph six of the same agreement which said that "no self-incriminating information given by Compton will be *used* to enhance the Offense Level" recommended during sentencing. *Id*. (emphasis added) (internal brackets). The Probation Office subsequently included Compton's proffer statements in the PSR and then relied on them to recommend a particular sentence. *Id*. In trying to make sense of the proffer agreement, we distinguished between "provid[ing]" and "using" the information: "[u]nder the proffer agreement, the government could provide Compton's proffer statements to the district court, but it could not per se recommend that the court increase Compton's offense level based on that information." *Id*. Because the government did rely on the protected statements to recommend an increased offense level, the government breached. *Id*. But, we also noted the apparent incongruity of the provisions in the proffer: "[b]y their very nature, paragraphs five and six of the agreement [containing the provisions allowing the government to provide but not use the statements] are almost irreconcilable; short of attaching the defendant's proffer statements to materials provided to the court for sentencing purposes, any other mention of information obtained from the proffer will likely violate the agreement." *Id*. The government argues in this case that including Bennett's statements in the PSR and marking them "protected," goes no further than "attaching the defendant's proffer statements to

materials provided to the court for sentencing"; Bennett disagrees and argues that the government's actions constitute "direct use."

We need not resolve this close question or the government's companion argument that Bennett's attorney's statements in emailed plea negotiations constituted a breach.[1] Even if the government did breach, any error by the district court in relying on wrongly-provided information was harmless. *See* 28 U.S.C. § 2111; Fed. R. Crim. P. 52(a). The government presented multiple sources of evidence for the same propositions that Bennett argues were supported solely by his proffer interview. Therefore, the district court would have come to the same conclusion and imposed the same sentence, even absent the allegedly improper information.

To understand why this is so, it is necessary to walk through Bennett's second, and related, argument—that the district court improperly attributed the 33.9 grams

---

[1] We note in passing that the proffer letter is unclear as to whether emailed plea negotiations are a forum in which Bennett could permissibly renounce his prior statements. The letter provided a non-exclusive list of fora in which Bennett was precluded from taking an inconsistent position, but that list included only formal judicial proceedings. (R. 231-2 at 2-3) ("testi[mony] at trial . . . or . . ., during cross-examination of witnesses, through witness testimony, or during arguments"). The parties, unsurprisingly, differed at oral argument over whether emailed plea negotiations should be included. Because of our harmless error analysis, a resolution is unnecessary.

of crack cocaine to him as applicable "relevant conduct." The PSR included the crack cocaine in the bundle of narcotics used to calculate Bennett's recommended base offense level of 26. The district court accepted that recommendation at sentencing. Bennett argues that, without the proffer interview, the Probation Office, and thus also the district court, lacked a factual basis for attributing the crack cocaine to him. That is the only harm that Bennett alleges flowed from the government's improper use of his statements.

Although he does not couch it in these terms, Bennett really argues that the district court committed a "significant procedural error." *Gall v. United States*, 552 U.S. 38, 51 (2007) ("[The reviewing appellate court] must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range."). The Supreme Court did not have occasion in *Gall* to decide whether a significant procedural error can be harmless, but we have since held that it can in certain circumstances. *See United States v. Abbas*, 560 F.3d 660, 666 (7th Cir. 2009). Those circumstances exist "only . . . when the government has proved that the district court's sentencing error did not affect the defendant's substantial rights (here—liberty). To prove harmless error, the government must be able to show that the . . . error did not affect the district

court's selection of the sentence imposed." *Id.* at 667 (internal quotation marks omitted). Here, the government makes such a showing.

If we ignore the statements from the proffer session, the facts marshaled by the Probation Office to support a showing of responsibility are substantial. The "Offense Conduct" and "Witness Statements" sections of the PSR also include multiple other references to Bennett's responsibility for the crack cocaine. Paragraphs 34 and 35 include Green's testimony that Hill transported drugs, including the crack cocaine, for Bennett. Paragraphs 42 and 43 recount Hill's testimony to a federal grand jury that Bennett demanded payment for the cocaine as he beat her. And, paragraph 31 describes Bennett's demands that "Sweet Lou" hand over the drug money, including money for the crack cocaine.

The government argues that the PSR permissibly relied on these other facts to ascribe responsibility for the cocaine to Bennett without having to resort to the proffer-protected statements, and we agree. Importantly, the PSR does not specifically reference or cite the protected statements in the "Relevant Conduct Analysis" of the PSR. Rather, Paragraph 53 states that Bennett "was aware the cocaine was in the bag because, during the beating of Hill, he was requesting payment for the marijuana, ecstasy, and cocaine." This statement was consistent with Hill's grand jury testimony. Because there was such overwhelming, non-proffer-protected evidence that Bennett demanded payment for the crack cocaine from various persons (including an undercover

DEA agent), it was appropriate for the PSR to consider him responsible for it.

The district court similarly marshaled significant evidence of Bennett's responsibility when it sentenced him. And, none of the pieces of information that the district court listed as support for its decision came solely from Bennett's proffer statement. In fact, although Bennett claimed responsibility for the cocaine during the proffer interview, the district court acknowledged that "[i]t's true that . . . Kelly was the one that supplied [the crack cocaine] to Ms. Hill." (R. 252 at 35.) The court went on to note, however, that "Mr. Bennett worked with . . . Kelly distributing controlled substances," and that Bennett "was involved in Mr. Kelly's efforts to reach Ms. Hill to retrieve the drugs" in Madison on January 27. (*Id.*) Further, the district court described how Bennett beat Hill once she returned to Chicago, and the court maintained that "Bennett's anger with Ms. Hill was not because she didn't bring payment for the marijuana and ecstasy, but because she didn't bring money for the expensive part of the venture, which was the crack cocaine." (*Id.* at 25-26.) The court concluded that "the crack cocaine is properly attributable to [Bennett] as part of his relevant conduct." (*Id.* at 26.)

The district court disregarded the only relevant piece of information that came solely from the proffer session: Bennett's claim to have supplied the crack cocaine. (R. 252 at 35.) Instead, it relied on an alternate version of events to determine Bennett's sentence. There were other, and sometimes multiple other, sources for each fact the district court used to support its decision, in-

cluding, in particular, Hill's grand jury testimony and Special Agent Gade. The necessary conclusion is that any alleged "error [occasioned by the government's use of the proffer statements] did not affect the district court's selection of the sentence imposed." *Abbas*, 560 F.3d at 667 (internal quotation marks omitted). Therefore, any error in the use of the proffer statements was harmless, so long as it was substantively correct for the district court to otherwise attribute the crack cocaine to Bennett. We conclude as much below, so we can—and do—find that any reliance on the proffer statements was indeed harmless.

B.   *Inclusion of the 33.9 Grams of Crack Cocaine as Relevant Conduct*

Having determined that the district court would have included the 33.9 grams of crack cocaine as relevant conduct even without Bennett's proffer statements, we must still assess whether that finding itself was correct. Bennett argues that including the crack cocaine was improper. We disagree; even giving Bennett the benefit of the doubt and ignoring his proffer statements admitting responsibility, we think the "relevant conduct" determination was appropriate.

We review a district court's application of the sentencing guidelines *de novo*, but we give greater deference to its factual determinations and review them for clear error. *United States v. Sheneman*, 682 F.3d 623, 630 (7th Cir. 2012). We will upset a district court's factual determination "only if our review of all the evidence leaves us with

the definite and firm conviction that a mistake has been made." *United States v. Robertson*, 662 F.3d 871, 876 (7th Cir. 2011).

The Probation Office used U.S.S.G. § 2D1.1(c) to determine Bennett's recommended sentence. That section recommends specific offense levels corresponding to specific drug quantities involved in the particular crime. To determine which drugs were involved, application note 5 directs that "[t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level" and provides a cross-reference to U.S.S.G. § 1B1.3(a)(2) (Relevant Conduct). U.S.S.G. § 2D1.1, cmt. n.5. U.S.S.G. § 1B1.3, in turn, defines "relevant conduct" for the purposes of determining the appropriate guideline sentence. Subsection (a)(1) provides that courts should consider:

> all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and . . . in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

U.S.S.G. § 1B1.3(a)(1). For purposes of controlled substances, application note 2 states that "the defendant is

accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3 cmt. n.2. The Probation Office determined that the 33.9 grams of crack cocaine found on Hill should thus be included as part of the offense conduct for Bennett. The district court agreed.

Bennett makes two arguments objecting to that finding: one based on the district court's factual determinations and one based on its legal reasoning. First, Bennett argues that he was not in fact responsible for (or perhaps even aware of) the crack cocaine. Second, he argues that, even if the government could prove his awareness or responsibility, his involvement with the crack cocaine is not "relevant conduct" under the sentencing guidelines. We review the first, a question of fact, for clear error and the second, a question of law, *de novo. Sheneman*, 682 F.3d at 630.

### 1. The district court's factual determination

The argument that the 33.9 grams of crack cocaine found on Hill were not "reasonably foreseeable" or otherwise factually attributable to Bennett is a non-starter. We accept the district court's finding that "Kelly was the one that supplied [the crack cocaine] to Ms. Hill." (R. 252 at 35.) But Bennett acted as the *de facto* enforcer. When Hill returned to Chicago without the drugs or the money, Bennett beat her. He demanded payment

for not only the ecstasy and marijuana but also the crack cocaine. The district court reasoned that Bennett used such viciousness because of the value of the cocaine (which was far greater than that of the other two drugs). Thus, the district court concluded that Bennett showed some responsibility for it.

We do not think the court's logic is unreasonable; though, as Bennett points out, such logic does not *necessarily* establish Bennett's knowledge of the cocaine prior to or during the commission of the offense of conviction itself. Merely introducing a plausible alternative story, however, is not enough to meet the clear error standard of review. *United States v. Rice*, 673 F.3d 537, 540-41 (7th Cir. 2012) ("the task on appeal is not to see whether there is any evidence that might undercut the district court's finding; it is to see whether there is any evidence in the record to support the finding"). Here, there is other evidence supporting the district court's decision. Bennett undermines his own argument, for instance, by going to some length in his brief to distinguish himself from Kelly. Bennett admits that the record establishes that he "was a marijuana and MDMA distributor and known as such." (Appellant's Br. at 22.) Bennett contrasts his reputation with that of Kelly, who "was a cocaine dealer." (*Id.*) In undertaking a joint narcotics venture with an established cocaine dealer, it is reasonably foreseeable that some quantity of cocaine will be involved. Based on Bennett's demands of Hill during the beating, it appears he was aware (at least) that an amount of cocaine with significant value was at stake. We are not left "with the definite and firm conviction

that a mistake has been made" here and do not find a clear error in the district court's factual findings. *Robertson*, 662 F.3d at 876.

### 2. *Application of the sentencing guidelines to the facts*

Notwithstanding the above, for the conduct to be considered at sentencing, reasonably foreseeable activity undertaken by associates must be in furtherance of "jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1). According to Bennett, Kelly's use of Hill to transport the crack cocaine was not. Again, we disagree. Here, transporting narcotics from Chicago to Madison—an activity for which Bennett and Kelly had *together* engaged Hill on multiple occasions—was "jointly undertaken criminal activity, that occurred during the commission of the offense of conviction." *Id*. Kelly used Hill to transport crack cocaine while Bennett jointly used her to transport his drugs, a fact each knew. This certainly furthered the joint criminal activity of narcotics transportation: it allowed Bennett to split costs with Kelly. Further, the fact that Bennett beat Hill while requesting money for all the drugs, including the cocaine, provides significant evidence that this truly was "jointly undertaken criminal activity," and that Bennett had some interest in Hill returning the money for the cocaine. Thus, we again find no error in the district court's reasoning. It was proper for the district court to use the 33.9 grams of crack cocaine to determine Bennett's base offense level.

*C. Organizer/Leader Enhancement*

Bennett similarly alleges that the district court erred in applying a two-level upward adjustment for his leadership role in the offense. Again, we review the district court's application of the guidelines *de novo*, while we review the factual determination of Bennett's role in the offense for clear error. *Robertson*, 662 F.3d at 876.

U.S.S.G. § 3B1.1(c) provides that "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity . . . , increase [the base offense level] by 2 levels." To determine if a defendant occupies such a position, we again turn to the definition of "relevant conduct" and analyze activity "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(B). Bennett argues that the activity upon which the court based its conclusion falls outside the definition of § 1B1.3; that is, it did not occur within any of the relevant time periods. He also argues that, even if it did, the activity was not sufficient to merit labeling him an "organizer, leader, manager, or supervisor." U.S.S.G. § 3B1.1. We address those arguments in turn.

*1. Bennett's conduct during the relevant time periods*

Bennett pled guilty to possession with intent to distribute both ecstasy and marijuana. He thus argues that, "[t]he criminal act for which [he] pleaded guilty ended when he relinquished the narcotics for transportation

to Madison." (Appellant's Br. at 25.) Under Bennett's logic, then, none of his interactions with Hill after handing over the drugs in Chicago could be used to show that he supervised her. The district court, however, used Bennett's apparent control over Hill during the transportation of the drugs as the basis for the § 3B1.1 enhancement.

Bennett's interpretation of the timing and geography of the conviction offense is simply incorrect. Importantly, he pled guilty to possession with the intent to distribute *in the Western District of Wisconsin*. (R. 1 at 5) (charging Bennett with possessing MDMA with the intent to distribute "in the Western District of Wisconsin and elsewhere"); (R. 225 at 2) (stating that "this guilty plea will completely resolve all possible federal criminal violations that have occurred in the Western District of Wisconsin.") Because Bennett never had physical possession of the narcotics while in Wisconsin, the convicted possession must have been—at least partially—through Hill. *See* 18 U.S.C. § 2 (providing that a person can be liable as a principal even if the criminal act is carried out by another). The criminal act for which Bennett pled guilty did not end when he handed over the narcotics in Chicago; therefore, Bennett's argument that the interactions between Bennett and Hill fall outside the scope of § 1B1.3 has no merit.

### 2. *Sufficiency of Bennett's activity*

Bennett continues, however, that, even if we are permitted to analyze his interactions with Hill, they do not rise

to a level indicating that he was "an organizer, leader, manager, or supervisor." § 3B1.1. We disagree and cannot find error in the district court's ruling.

U.S.S.G. § 3B1.1 provides for a sentencing enhancement when the convicted individual played a specific role in the offense. As noted, subsection (c) (under which Bennett was sentenced) provides a two-level enhancement when the defendant was an "an organizer, leader, manager, or supervisor." U.S.S.G. § 3B1.1(c). Subsection (a), however, provides for a four-level enhancement only where the defendant was an "organizer or leader" of a large criminal enterprise. U.S.S.G. § 3B1.1(a). Subsection (b), in turn, gives a three-level enhancement only where the defendant was a "manager or supervisor" of such an enterprise. U.S.S.G. § 3B1.1(b). Application note 4 of § 3B1.1 helpfully provides seven factors that courts "should consider" in "distinguishing a leadership and organizational role from one of mere management or supervision." Included among the factors are "exercise of decision making authority . . . , the recruitment of accomplices, [and] the claimed right to a larger share of the fruits of the crime." *Id*. Despite the apparently clear purpose of the application note to be used to help contrast subsections (a) and (b), Bennett asks us to use these factors to assess the appropriateness of subsection (c) to his case. This was not a completely outlandish request, as we (as well as our sister circuits) have applied these factors to the question of whether a defendant had any sort of leadership role—not merely for distinguishing between roles. *See, e.g., United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008); *United States v. Mustread*, 42 F.3d 1097, 1104-05 (7th Cir. 1994); *see also*

*United States v. Jackson*, 639 F.3d 479, 483 (8th Cir. 2011); *United States v. Gonzalez Edeza*, 359 F.3d 1246, 1248-49 (10th Cir. 2004); *United States v. Taylor*, 248 F.3d 506, 515-16 (6th Cir. 2001).

Recently we have noted the apparent absurdity of that approach—the application note helps to distinguish between the distinct roles of "leader" or "organizer" and "manager" or "supervisor," while subsection (c) is aimed at defendants who inhabit any of those roles. *United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012). Perhaps this is why in prior cases where we used the seven factors, we have advised that "slavish adherence to them is unnecessary: the ultimate question is what relative role the defendant played." *Mustread*, 42 F.3d at 1104 n.3. Here, we follow that guidance. We do not think the district court wrongly determined that Bennett's role was that of "an organizer, leader, manager, or supervisor." U.S.S.G. § 3B1.1(c).

The district court observed during sentencing that "Hill stated and testified that she met Mr. Bennett in 2005 and began transporting drugs between Chicago and Madison *for* him." (R. 252 at 26) (emphasis added). Further, Bennett acknowledged during the sentencing process and acknowledges again in his briefs to this court that he used Hill as his courier on multiple occasions. (Appellant's Br. at 4.) Like the district court, we think all of this speaks to Bennett's role as, at least, a manager or supervisor of Hill.

*Figueroa* is an instructive comparison and takes what might be described as a plain-meaning approach to

§ 3B1.1. 682 F.3d at 697. There, the defendant arranged for a man named Cruz to travel from Texas to Chicago transporting drugs. *Id*. at 696. Figueroa claimed, however, to be merely a "conduit"; that is, he only passed along instruction from his boss to Cruz. *Id*. Regardless, we determined that "[t]he defendant supervised Cruz. He told him where to go to get the drugs and, when he returned with them, where to meet him to deliver the drugs and get paid." *Id*. at 697. Thus, the § 3B1.1 enhancement was appropriate. *Id*. at 698.

We think the case here is just as clear. Like Figueroa, Bennett told his drug courier, Hill, "where to get the drugs and, . . . where to meet him to deliver the drugs and get paid." *Id.* at 697. Bennett claims that Hill was simply somebody else's (Kelly's) supervisee and that he occupied no supervising role. Evidence of Hill's primary employer may indeed be ambiguous, but it is clear that Bennett took it upon himself to mete out a punishment when she did not follow instructions. Upon discovering that she did not have the drug money, Bennett forced Hill to strip, beat her, and burned her, all while demanding the money. Although most supervisors do not terrorize their subordinates (at least not physically), administering sanctions for poor work quality is a quintessential supervisory task. Regardless of who gave Hill more instruction during the course of the relationship, it is clear that Bennett acted as *a* supervisor (perhaps along with Kelly) in this particular instance. We do not think the district court erred in coming to that same conclusion and applying the enhancement.

*D. Acceptance of Responsibility Credit*

Finally, we find no merit to Bennett's argument that the district court erred in failing to credit him for acceptance of responsibility under U.S.S.G. § 3E1.1(a). Our review of the district court's decision is once again for clear error. *United States v. Etchin*, 614 F.3d 726, 739 (7th Cir. 2010). Because we are "ill-equipped to assess whether a particular defendant is motivated by genuine acceptance of responsibility or by a self-serving desire to minimize his own punishment," we afford "great deference" to the sentencing judge in such cases. *United States v. Gilbertson*, 435 F.3d 790, 799 (7th Cir. 2006).

U.S.S.G. § 3E1.1(a) provides that a court may decrease the offense level by two levels "[i]f the defendant clearly demonstrates acceptance of responsibility." Bennett argues that—following his four-year flight from the law under an assumed name, arrest, and removal to Wisconsin—he pled guilty and "clearly accept[ed] responsibility" and that it was error for the court to ignore this acceptance. Based on *United States v. Lallemand*, 989 F.2d 936 (7th Cir. 1993), Bennett argues that, because there is not a necessary logical incompatibility between his obstruction of justice (for which he received a sentencing enhancement) and possible acceptance of responsibility, he is entitled to the § 3E1.1(a) reduction. That argument misconstrues our precedent.

Although a sentencing enhancement for obstruction of justice "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct," U.S.S.G.

§ 3E1.1(a) cmt. n.4, Bennett is correct to point out that such a relationship is not required. The presumption that the relationship exists, however, can only be rebutted by a defendant in an "extraordinary case[ ]." *Id.*; *see also United States v. Black*, 636 F.3d 893, 900 (7th Cir. 2011). Bennett argues that the timing of his actions is key and makes his case "extraordinary": while he obstructed justice during his four years on the run, he clearly manifested an acceptance of responsibility by pleading guilty after his arrest. However, simply because Bennett can argue that the district court was not required to *deny* him the two-level credit, it does not follow that the court was then required to *grant* him the credit. We have never used "extraordinary" in this setting to refer only to the issue of timing, in fact we have explicitly rejected that notion. *See United States v. Buckley*, 192 F.3d 708, 711 (7th Cir. 1999) (rejecting the argument that a defendant who earlier obstructed justice may "wipe the slate clean, and earn the acceptance of responsibility discount, just by pleading guilty and thereafter refraining from obstructing justice further"). The district court did not find that Bennett presented an extraordinary case, (R. 252 at 26-27), and we do not think that decision was clearly erroneous.

*Lallemand* is not to the contrary. In *Lallemand*, the defendant directed a friend to destroy evidence upon the defendant's arrest. 989 F.2d at 937. Immediately following the defendant's arrest, however, he confessed, began cooperating with law enforcement, and even phoned the friend to tell him not to destroy the evidence (an impossible request, it turned out, as the friend had followed the instructions faithfully). *Id*. at 937-38. We found

that the enhancement and the credit were not mutually exclusive under those circumstances—though Lallemand did obstruct justice, he almost immediately sought to minimize the effect of that obstruction and cooperated with the authorities to the full extent of his ability. *Id.* at 938-39. The district court held that behavior to be extraordinary, and we did not find that decision incompatible with the upward adjustment.

In the same vein, we defer to the district court's decision here and cannot find that it clearly erred in finding Bennett's case *not* to be extraordinary. Bennett's obstruction—fleeing and living in Atlanta under an assumed name for four years—was more significant, and the evidence of his purported acceptance of responsibility—a guilty plea—was more dubious than in *Lallemand*, the case on which Bennett relies. The district court found that Bennett cooperated post-arrest "because he believed it would help him . . . , not because he really accepts responsibility." (R. 252 at 27.) That determination "is entitled to great deference on review." U.S.S.G. § 3E1.1 cmt. n.5. We afford the district court that deference here and find that it was not clearly erroneous to deny Bennett the two-level § 3E1.1(a) credit.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.